**UNITED STATES v. PARKER et al.**
(three opinions).

District Court, D. New Jersey.
March 22, 1937.

On Application for Change of Venue
April 14, 1937.

On Motion for a Bill of Particulars
April 26, 1937.

John J. Quinn, U. S. Atty., of Red Bank, N. J., and Hubert J. Harrington, of Newark, N. J., Asst. U. S. Atty., for the United States.

James Mercer Davis, of Camden, N. J., and George S. Silzer, Harry Green, and Harry H. Weinberger, all of Newark, N. J., for defendants.

CLARK, District Judge.

The United States complains of a violation of one of its statutes. That statute is codified as sections 408a and 408c of title 18 United States Code Annotated. They read:

"Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine: Provided, That the failure to release such person within seven days after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a presumption that such person has been transported in interstate or foreign commerce, but such presumption shall not be conclusive."

"If two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of sections 408a and 408b of this title, and do any overt act toward carrying out such unlawful agreement, confederation, or conspiracy, such person or persons shall be punished in like manner as provided for by said sections."

An interesting and scholarly article on the origin and contents of this statute has been prepared by two lawyers in the Department of Justice (where it was drafted). It is to be found in the June, 1935, issue of the New York University Law Quarterly Review and is entitled, "Kidnapping and the So-called Lindbergh Law," by Hugh A. Fisher and Matthew F. McGuire. Its first and last paragraphs graphically describe the character and prevalence of the evil the Congress attempted to correct:

"It was the Lindbergh kidnapping that awakened the American people to the fact that they were face to face with a species of crime so revolting and which had assumed such proportions that it seemed that unless the menace was met fearlessly and with a determination to end it, the very sanction of the criminal law was threatened."

"That the passage of this law has had a most salutary effect in the breaking up of this nefarious traffic is best evidenced by the record (Rep.Att'y Gen. 130, 1934). Since its passage 29 cases of kidnapping have fallen within the investigative action of the Government, resulting in the conviction of 69 persons. The sentences imposed included 16 life sentences, 2 death sentences, and imprisonments totaling 1,139 years, 11 months, and 2 days. Among the defendants, 2 were lynched, 3 committed suicide, and 1 was murdered, while at present 14 persons are in custody awaiting trial—proving, it would seem, the wisdom of Congress in enacting the law and thus threatening the perpetrators of this type of crime with swift, certain, and heavy-handed punishment."

Cf. "The Snatch Racket," by Edward Dean Sullivan, The Vanguard Press, N. Y., 1932.

The government phrases its complaint in the form of an indictment, the legally required manner of accusing of crime. The defendants maintain that they should not be put to trial on this indictment and express their position by the appropriate legal method, namely, demurrer. They say, first, that the physical acts complained of are not described in the Lindbergh Law; second, that the mental acts complained of are not covered by the Lindbergh Law; and, third, that the acts com-

plained of are not set forth in "sufficient detail to properly apprise the defendants of the accusation they must meet."

Defendants' first objection is untimely. Their argument is based on a recent decision of the United States Supreme Court. Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522. In that case, a convicted kidnapper sought to escape punishment on the ground that the Lindbergh Law reaches only cases where the kidnapped person is held for "reward or ransom." This loophole or gap, depending upon the point of view, seems to have arisen because of the legislative selection. The books disclose two types of statutes. The first type includes the words "reward or ransom" and relates to extortion generally; the second prescribes and punishes any "forcible taking away" for whatever purpose. This latter type simply extends the common law. Cf. Blackstone's Commentaries on the Laws of England, vol. 2, pp. 1379, 1380; P. L. New Jersey 1898, § 114, p. 826, as amended P.L. New Jersey 1907, p. 103 (2 Comp.St.N.J.1910, § 114, p. 1783).

Congress in the original Lindbergh Law of June 22, 1932 (47 Stat. 326), selected the former type. By 1934 the inadequacies of the limitation seem to have been apparent and the act was amended (section 408a, title 18 U.S.C.A.). This amendment did not revert to the second or more general type of statute, but merely added the words "or otherwise" after "ransom or reward," thus affording an opportunity for the contention that the curious rule of ejusdem generis applies. Sutherland, Statutes and Statutory Construction, § 422 et seq. The rule itself has been much qualified (Sutherland, Statutes and Statutory Construction, §§ 437–441) and has, in our opinion, no logical application to the adverb "otherwise." Fisher v. City of Astoria, 126 Or. 268, 269 P. 853, 858, 60 A.L.R. 260. The cases holding to the contrary seem to us lacking in grammatical understanding.

■ However that may be, the indictment at bar on pages 6, 7, and 8 expressly charges a pecuniary benefit to the defendants through the publication of the statements of the allegedly kidnapped person. Unless and until the proof fails to support this allegation, we are not concerned with the question of the intention of Congress as expressed in the adverb.

■ Defendants' second point seems to have been overlooked in the cases previously adjudicated under the statute. Skelly v. United States (Berman v. United States) (C.C.A.) 76 F.(2d) 483; Bailey v. United States (C.C.A.) 74 F.(2d) 451. It is that the conspiracy to transport must have arisen at some time after and not before the unlawful seizure. Such a contention is in our opinion contrary to one of the two reasons for the existence of the law of conspiracy. A conspiracy by reason of its character as an agreement speaks in the future. It must precede the acts agreed upon. Conspiracies are dangerous to the state because their essence is numbers and premeditation. Many wicked men plotting evil. Where, then, is the logic in shortening the period for planning or in having it begin after the harmful use instead of at any time the wickedness may happen to be agreed upon? Any contrary doctrine gives conspirators an easy out. Let them conspire with sufficient forethought and they are safe. The premeditation, which is the country's peril becomes their excuse.

There is nothing in the statute inconsistent with this common sense principle. Defendants maintain a contrary intendment because of (1) the use of the phrase "shall have been," (2) the inclusion of the prohibition against conspiracies in the statute itself, and (3) the fact that the crime is transporting in interstate commerce a person already seized. The unsoundness of the first two thoughts requires no elaborate exposition. The statute follows the most approved form of draftmanship of criminal statutes and reads in the future. Grammatical perfection and nothing else can be deduced from the use of the future perfect "shall have been." Equally no significance can be attached to the inclusion of the conspiracy section in the statute itself. It is often done (cf. U.S.C.A., title '0, § 1566; title 12, § 1138d (f); title 15, §§ 1, 2, 3, 8; title 18, §§ 6, 51, 54, 80–83, 88, 242, 252, 420a–420e, 487; title 22, § 234; title 26, § 1828(e); title 38, § 715; title 50, § 31–42) either for reasons of convenience or punishment.

Defendants' attempt to claim any legal advantage because the statute strikes at the transportation of a person already seized implies a misunderstanding and indeed a negation of the theory of federal criminal justice. This opinion is not the place

to expound our hobby of comparative federalism. Suffice it to say that our Constitution differs from that of most federations in failing to allocate the definition, at least, if not the administration of criminal law to the central government. Cf. Constitution of Australia, chap. 1, art. 51, § 28; Constitution of Canada, chap. VI, § 91, art. 27; Constitution of India, List III, part I, arts. 1–3; Constitution of Germany, part I, art. 7, § 2. The pressure of events as usual has forced the filling of the gap by the convenient, but perhaps slightly shady, method of con amore interpretation. So we find the enumerated powers becoming the vehicle of the very "internal police" specifically objected to by the draftsmen who met on our Mt. Sinai (more widely known as Philadelphia). An interesting account of this process and its expansion is to be found in chapters 7 and 19 of Federal Centralization, by Walter Thompson. The learned author very pertinently observes:

"Congress is not empowered by the Constitution to legislate for the welfare of the citizens of the several states, but by a liberal exercise of its constitutionally granted powers it has accomplished this indirectly. In the field of social legislation, as defined here, the main subjects that Congress has attempted to regulate are lotteries, vice, food and drugs, child labor, education and intoxicating liquor." Page 103.

"The question of centralization and decentralization of governmental functions is one that is at present confronting every large state. In the United States, however, due to our peculiar dual system of control, it becomes of special interest. The very nature of a federal power such as the power to regulate commerce presents a serious difficulty. While it permits a certain degree of federal control it is after all a specific, enumerated power. But since, like the taxing power, it is general in its application, it has furnished a convenient constitutional peg on which to hang incidental regulations. This leads to legislation by indirection, a practice which is resorted to under systems of limited powers. It often happens in the United States that a generally desired object can be attained only by indirection." Page 351.

An increasingly mechanical civilization leads us to expect especial emphasis on the postal and commerce power. We are not disappointed. Chapter 8 of title 18 (section 301 et seq.) and chapter 9 of title 18 (section 381 et seq.) U.S.C.A. (the Criminal Code) contain the crimes deriving their constitutional validity from those much discussed and more defined powers. These lists show 59 separate and distinct crimes under chapter 8, a few being, conducting post office without authority, illegal carrying of mail by officials, stealing post office property, stealing, secreting, or embezzling mail matter, obstructing the mail, using mails to promote frauds; 32 separate and distinct crimes under chapter 9, a few being, violent interference with foreign commerce, carrying explosives, importing lottery tickets, importing injurious birds and animals, transportation of illegally killed game, marking of packages, importing and transporting obscene books, white slave traffic, prize fight films, transportation or importation, motor vehicles, transportation, etc., of stolen vehicles, larceny, etc., of goods in interstate or foreign commerce, embezzlement, etc., by officers of carrier, and last but pretty obviously not least the crime charged in the indictment.

As the criminal law by definition is for the protection of the community from harm, Congress closes the channels of commerce or the mails to the subjects it deems harmful. The harmful element or quality may be in either past, potential or future use. Stolen cars, persons, or property illustrate the first; lottery tickets, contraceptives, or firearms the second; and women, letters, and prize fight films the last.

The defendants finally pretend an uncertainty as to the accusation against them. We do not say "pretend" critically, because we realize that this sort of pretense is quite customary. The fact is, however, that the accusations of this indictment are in rather shocking detail. We shall not reiterate them because we realize that each repetition may influence that public opinion which is common to the processes of justice in a democracy.

The Supreme Court of the United States has laid down the general rule in the case of Wong Tai v. United States, 273 U.S. 77, at pages 80, 81, 47 S.Ct. 300, 301, 71 L.Ed. 545, saying:

"The defendant demurred to the indictment on the ground that its allegations as to the conspiracy and overt acts were so vague, indefinite and uncertain that

they did not inform him of the nature and cause of the accusation as required by the Sixth Amendment, and enable him to make proper defense or plead his jeopardy in bar of a later prosecution for the same offense. This demurrer and a subsequent motion made in arrest of judgment on the same grounds, were both overruled by the District Court.

"While it is essential to the validity of an indictment under the Federal Constitution and laws that it shall advise the defendant of the nature and cause of the accusation in order that he may meet it and prepare for trial, and after judgment, be able to plead the record and judgment in bar of a further prosecution for the same offense, Bartell v. United States, 227 U.S. 427, 431, 33 S.Ct. 383, 57 L.Ed. 583, we find in the present indictment no lack of compliance with this requirement. It charged the defendant, with definiteness and certainty and reasonable particularity as to time and place, with conspiring with a named person and others to commit certain specified offenses in violation of the Opium Act [21 U.S.C.A. § 171 et. seq.]; and further charged him, in like manner, with doing various specified acts to effect the object of the conspiracy. It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, Williamson v. United States, 207 U.S. 425, 447, 28 S.Ct. 163, 52 L.Ed. 278, or to state such object with the detail which would be required in an indictment for committing the substantive offense, Thornton v. United States, 271 U.S. 414, 423, 46 S.Ct. 585, 70 L.Ed. 1013; Jelke v. United States (C.C.A.), 255 F. 264, 275; Anderson v. United States (C.C.A.), 260 F. 557, 558; Wolf v. United States (C.C.A.) 283 F. 885, 886; Goldberg v. United States (C.C.A.) 277 F. 211, 213. In charging such a conspiracy 'certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary.' Williamson v. United States, supra [207 U.S. 425] 447, 28 S.Ct. [163] 171 [52 L. Ed. 278]; Goldberg v. United States, supra [277 F. 211] 213."

Cf. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Enrique Rivera v. United States (C.C.A.) 57 F. (2d) 816, 817; Coates v. United States (C.C.A.) 59 F.(2d) 173; Capriola v. United ed States (C.C.A.) 61 F.(2d) 5, certiorari denied 287 U.S. 671, 53 S.Ct. 315, 77 L. Ed. 579.

In our opinion, the indictment at bar describes the means used to accomplish the conspiracy in a detail greater than that required by the rule. set forth in the above quoted case and other binding authorities.

The demurrer is overruled.

## On Application for Change of Venue.

The utter unreality of much of our criminal procedure is a matter of common knowledge. Wickersham Reports, No. 8, p. 23—Criminal Procedure—Jury Trials. As the harsh logic of events emphasizes each fresh instance thereof, we hear a fresh demand for a nearer approximation of social fact and legal fancy. The application at bar is, in our opinion, such an instance.

We make this comment for two reasons. First, and important to the public, the issue is one of the construction of statutes, the statutes being as to the offense charged: "Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnapped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine." U.S.C.A., title 18, § 408a. As to the venue, "The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience." U.S.C.A., title 28, § 101. And under the canons of judicial ethics our duty is plain and is thus stated: "A judge has exceptional opportunity to observe the operation of statutes, especially those relating to practice, and to ascertain

456

whether they tend to impede the just disposition of controversies; and he may well contribute to the public interest by advising those having authority to remedy defects of procedure, of the result of his observation and experience." Reports of the American Bar Association vol. 61, p. 1032, § 23, Legislation. Second, and important to the defendants, our duty to minimize that unreality may have a bearing on the interpretation of the statutes.

■ At the outset we must call attention to a most unusual situation. So unusual, in fact, that we felt conscientiously constrained to speak of it to counsel at the argument. The section of the judicial code relied upon is limited to "offenses punishable with death." We conceded upon the argument and we now concede that the word "punishable" means possibly punishable. State v. Barone, 96 N.J.Law, 374, 114 A. 809; In re.Baronne, 97 N.J.Law, 249, 117 A. 163. We further concede, and it is obvious, that the jury's absolute discretion imports such a dire possibility (that was the precise point of the New. Jersey cases above cited).

■ We cannot and therefore do not concede even the possibility of the death penalty in the case. at bar. We do not so interpret the proviso of the statute. That proviso (already quoted) reads as follows: " * * * provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnapped person has been liberated unharmed." The significant words are, of course, "liberated unharmed," a past participle and an adjective with the negative prefix "un." The phrase is capable of two grammatical interpretations. The harm may relate to the period of captivity and it may relate to the moment of release or liberation—or, in other words, Congress may mean to punish with death (the jury concurring) kidnappers who have harmed their victim at any time—or, on the other hand, Congress may mean to punish with death (the jury concurring) kidnappers who, at the time of the imposition of sentence, are unable to produce an unharmed victim. Either interpretation indicates a legislative intention to offer negative inducements to kidnappers. The first inducement is to conduct the kidnapping with, shall we say, the minimum of violence. The second inducement is to refrain from action leading either to permanent injury, to permanent captivity, or to death. The kidnapping effectuated without some forcible seizure, and therefore some bodily harm, must be the exception. We declare, therefore, for crediting Congress with intending the second inducement and preferring a cured and live victim to a dead or permanently injured one, even if the kidnappers must refrain from liberating until the cure is accomplished.

■ As the records disclose only one death sentence under the Lindbergh Law (18 U. S.C.A. § 408a et seq.), the precedents are equally limited. That one sad precedent supports our present interpretation. In Gooch v. United States, 82 F.(2d) 534, at page 535, the opinion of the Circuit Court of Appeals reveals that "The second count charged the same facts as the first count and further alleged that Gooch, and one Ambrose Nix, who was acting in concert with Gooch in the commission of the offense charged, did bodily harm to Baker, and that Baker was suffering from such bodily harm at the time he was liberated by Gooch in Oklahoma." In the case at bar the indictment reveals bodily harm (beating and torture, pages 3 and 9) and therefore makes the offense "punishable with death" (the jury concurring) if we accept a harm at any time theory of the statute. It is entirely silent, however, as to the victim's liberation and a fortiori therefore as to his bodily condition at such time. In our construction, accordingly, the government is foreclosed from any proof entitling them to demand (the jury concurring) the death penalty.

That being so, the possibility of punishment by death disappears and with it any application of section 101. In fact we cannot believe that counsel quite realize the consequences of their contention. In order to take advantage of an ephemeral anachronism (U.S.C.A. title 28, § 101) they insist upon a fatal construction. If the defendants' neighbors fail them, no court that listens to their counsel can help them. We are not persuaded and we do not think the crime charged can be punished by death or that the trial thereof need be had under the terms of section 101 above cited.

We have said that this question of the possibility of the death penalty is one of statutory interpretation, always a matter upon which reasonable men (or Supreme Court Justices) may differ. For that reason, we are going further and considering the motion upon the assumption that section 101 above cited does apply. Upon that assumption the problem becomes first again

one of interpretation and second a fitting of the facts to the meaning selected.

The statute fixes the place of trial (venue—law—Latin—visnetum—neighborhood—Co. Lit. 125a) "as the county where the offense was committed where that can be done without great inconvenience." The commission of a conspiracy depends upon the commission of the overt acts (Beale, Conflict of Laws, vol. 2, § 428.5, at page 1357). We intend later to suggest another and perhaps more subtle theory of the overt acts. The more obvious one fixes them at Mt. Holly and the New Jersey Colony for Feeble-Minded Males, both in Burlington county (overt acts 6 and 7 of the indictment, p. 10). The United States relies upon the "great inconvenience" of a trial in that county. We are forced then to an interpretation of the words and to an appraisal of the facts offered thereunder. The interpretation is probably rigid, the appraisement certainly discretionary. "Section 40 of the Judicial Code [28 U.S.C.A. § 101] does not confer upon a defendant an absolute right to a trial in the county where the offense was committed, but only a qualified right in cases where such a trial could be had 'without great inconvenience.' The District Court is vested with discretion in making this determination. The trial judge, after a hearing, determined that a trial could not be had at Beeville without great inconvenience, for reasons recited in the order, and which do not show any abuse of discretion, if indeed, they are not sufficient. Nothing less than an abuse of discretion would justify an interference by this court on appeal." Brown v. United States (C.C.A.) 257 F. 46, at page 48., Cf. Greenhill v. United States (C.C.A.) 6 F.(2d) 134; Hale v. United States (C.C.A.) 25 F.(2d) 430; Davis v. United States (C.C.A.) 32 F.(2d) 860. The latitude of meaning clearly comes in the word "great," an emphatic word, but still one of degree (suppose, for instance, it had been "utmost"). How should that degree be estimated? Should it be more or less, high or low? We think the latter two, and we think it because of the legal history of venue and of this and other statutes and constitutions prescribing it.

There are three possible interpretations of the venue requirement. It can be considered as an essence of an institution, the institution being, of course, the jury system. It can be considered as an administrative device fashioned for the convenience of the sovereign; or it can be considered as a privilege conferred upon the accused who may have reasons for preferring a trial in one place rather than in another. The relative validity of these three interpretations should, we think, control our estimate of the degree imported by the word "great" in the statute under construction.

If the county venue is any part of the essence of the jury system, any infringing of that essence must be strictly limited. The answer to this question is a chronological one. Venue was an essential element in indictment and trial by jury and venue is no longer an essential element in indictment and trial by jury.

We have neither the space nor the inclination for pedantry. Accordingly, we shall not discuss at any length the origin and development of the criminal jury. The best secondary sources are to be found under the following titles and pages, History of English Law by Pollock and Maitland, vol. 1, pp. 138, 151, 152, vol. 2, pp. 617, 621, 642, 647, 652, 653; Select Essays in Anglo-American Legal History, vol. 1, pp. 378, 379, 405, vol. 2, pp. 415, 446, 459, 485, 494, 514, 515, 528; Constitutional History of England by William Stubbs, vol. 1, pp. 299, 426, 427, 584, 651—653, 656, 662, 663; Gneist, Self-Government, i. 74 sq.; K. Maurer in the Kritische Ueberschau, v. pp. 180 sq., 332 sq.; and Forsyth, History of Trial by Jury; Thayer, Development of Trial by Jury; Palgrave, Rise and Progress of the English Commonwealth; Brunner, Entstehung der Schwurgerichte. One quotation from Pollock and Maitland seems sufficiently illustrative: "To all seeming Henry insisted first for Normandy in the year 1159, and then for England in the year 1164, that the ecclesiastical courts ought to make use of this institution. Laymen ought not to be put to answer in those courts upon a mere unsworn suggestion of ill fame. Either someone should stand forth and commit himself to a definite accusation, or else the ill fame should be sworn to by twelve lawful men of the neighborhood summoned for that purpose by the sheriff: in other words, the ecclesiastical judge ought not to proceed ex officio upon private suggestions. Henry seems to be forcing this rule upon reluctant prelates, and at the same time to be asserting that it is an ancient rule. From this we may perhaps infer that the synodal jury, described to us by Regino of Prum, had been known in Normandy—it may be, in England also—but that of late it had been thrust aside by a laxer procedure which

458

was less fair to the laity. This part of the story must remain very obscure. However in 1166 the accusing jury becomes prominent. In every county twelve men of every hundred and four men of every township are to swear that they will make true answer to the question whether any man is reputed to have been guilty of murder, robbery, larceny, or harbouring criminals since the king's coronation. Those who are thus accused must go to the ordeal. Even if they are successful there, even, that is to say, though the judgment of God is in their favour, they must abjure the realm. Ten years later at Northampton a sharper edge was given to this new weapon; forgery and arson were added to the list of crimes for which inquisition was to be made; the criminal who failed at the ordeal was to lose a hand beside that foot of which the earlier ordinance deprived him." Pages 151, 152, vol. 1.

It is apparent that the function of both the accusing (recognitors) and trying jury is the appraisement of repute. In the canon law of the ninth century and under the Assizes of Henry II the purpose was to free the community of suspicious characters. Even when the emphasis is shifted from repute in the sense of character to repute in the sense of the occurrence of events, the early juries still represented the voice of the countryside. Venue was essential to give effect to that voice.

The difference between that conception and our modern one would hardly seem to require elaboration. The entire effort of our criminal (civil too) procedure is to secure a jury which is ignorant of repute either in its sense of character or in its sense of events. It is surely not necessary to set forth the meticulous statutory provisions which insure jurors who do not know and are not in a position to know anything of either character or events. In fact the zeal displayed in this effort to empty the minds of the jurors has been the subject of some unfavorable and even humorous comment. We can conclude then that the jury no longer represents the voice of the countryside, but rather, like the court itself, is an impartial organ of justice. That being so, venue is no longer an essence of the institution.

The government's administrative interest in venue is self-evident. Similar considerations underly the familiar chancery vicinage rule. Scranton Button Co. v. Neonlite Corporation of America, 105 N.J.

Eq. 708, 149 A. 369. The United States' interest is plainly in the direction of underemphasis. For that reason, we pass on to the third interpretation, the statute's aspect as a privilege conferred upon the accused.

We were surprised at the argument by the failure of counsel to adduce two lines of historical references. The first, namely those dealing with the early history of the jury, we have already spoken of. The second, we think, support our view that the venue statute accords the defendant a personal privilege. Again we do not wish to be pedantic. We must, however, give some indication of the references we have in mind.

Article 9 of Mr. Charles Pinckney's draft of a federal government provided "all criminal offenses shall be tried in the state where they shall be committed." Madison's Journal of the Convention, p. 71. This provision eventuated in, in practically hæc verba, clause 3 of section 2 of article 3 of the Constitution U.S.C.A., Constitution, part 2, pages 334–337. This clause was reiterated in the Sixth Amendment, U.S.C.A., Constitution, part 2, pages 566, 574. The only difference between the Constitution and the amendment is the addition of the words "and district."

The reason for this desire to make assurance doubly sure appears quite clearly in the debates in the state ratifying conventions and with equal clearness appears our justification for the personal privilege interpretation. One quotation will suffice here also: "Mr. J. M'Dowall. Mr. Chairman, the objections to this part of the Constitution have not been answered to my satisfaction yet. We know that the trial by a jury of the vicinage is one of the greatest securities for property. If causes are to be decided at such a great distance, the poor will be oppressed; in land affairs, particularly, the wealthy suitor will prevail. A poor man, who has a just claim on a piece of land, has not substance to stand it. Can it be supposed that any man, of common circumstances, can stand the expense and trouble of going from Georgia to Philadelphia, there to have a suit tried?" Debates in the Convention of North Carolina, vol. IV of Elliott's Debates on the Federal Constitution, p. 143, and cf. Elliott's Debates on the Federal Constitution, vol. 2, p. 516, vol. 3, pp. 546, 568, 578, 579, vol. 4, pp. 144, 145, 147, 150–154, 165–167, 170, 171, 209, 294, 295.

We see the same underlying thought in the debates in the first Congress which enacted the statute in controversy as part of the first judiciary act or code. So Mr. Livermore observes: "Now, how is this jury to be constituted? Are they to come to the Supreme Court from the county in which the offense has been committed, or is the court to go to that place? We have heard cases spoken of, to arise under the mountains of Carolina, and be dragged down to the sea-shore; but the inconvenience of three or four hundred miles is nothing compared to what may take place under this system. Certainly this consideration must offer difficulties to every gentleman's mind; difficulties which can easily be avoided by pursuing another route." Annals of Congress, vol. 1, p. 814, and cf. Annals of Congress, vol. 1, pp. 452–454, 458, 757, 813, 814, 829, 833, 834, 849–852, 865, 866, 948, vol. 2, pp. 1869, 1893, 2193–2196.

The situation is this. The people feared that the new "consolidation" might injure them through the operation of a distant power upon local matters (they seem to still fear it). One instance where this distant power might affect them lay in power that the newly created national courts might have to move them about to distant places for trial. For that reason, they included clause 3 of section 2 of article 3, above cited, in the Constitution. For that reason, they reinforced the above-cited clause by the Sixth Amendment. For that reason partly this first Congress enacted section 101, 28 U.S.C.A. The qualification of the last sentence is deliberate and as will appear later, significant.

The Constitution and the statute protected the citizen against the power of these new and strange courts. It accorded a personal privilege like that of free speech, the right to be free from unreasonable searches, etc., also granted by constitutional amendment. Being a personal privilege, it must be measured by the reasons underlying the grant.

These reasons, as we have heard from the mouths of the early representatives of the people, were the expense and hardship of a trial at places remote from the defendant's home. The present application attempts to turn back the clock. It assumes that remote in 1787 is remote in 1937. We need scarcely answer this assumption by a lecture in the marvels of mechanical progress. The library of the New Jersey Historical Society contains some interesting accounts of the methods and manner of travel between Newark and Trenton in Revolutionary times. In addition to this failure to keep up with modern transportation, the defendants seem also to overlook the current more kindly attitude of the government towards those it is constrained to prosecute. So we find current, at least since August 8, 1846, statutory provision for the payment of the expenses of procuring witnesses on behalf of indigent defendants (U.S.C.A., title 28, § 656). We conclude that the interpretation of personal privilege is valid and that that privilege must be viewed in the light of the reason for its grant. That in the year 1937 requires a narrow construction of the modifying adjective great.

It is not always that the specific follows upon the general deduction, that the picture fits the frame. In the principal case the legislative history of the statute precluded this difficulty.

The venue provision under consideration (section 101) was originally section 29 of the First Judicial Code (1 Stat. 88) Annals of Congress, vol. 2, p. 2193. As so enacted it read: "That in cases punishable with death, the trial shall be had in the county where the offense was committed, or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence; * * * and the jurors shall have the same qualifications as are requisite for jurors by the laws of the State of which they are citizens, to serve in the highest courts of law in such State, and shall be returned as there shall be occasion for them, from such parts of the district from time to time as the court shall direct, so as shall be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burden the citizens of any part of the district with such services." On July 16, 1862, the words "twelve petit jurors at least shall be summoned from thence" were excised from the statute by repeal as follows: "That so much of section twenty-nine of an act entitled 'An act to establish (the) judicial courts of the United States,' approved September twenty-four, seventeen hundred and eighty-nine, as requires, in cases punishable with death, twelve petit jurors to be summoned from the county where the offense was committed, be, and the same is hereby, repealed." 12 Stat. at Large, p. 589, c. 189, § 2. The provision with respect to drawing an impartial jury was re-enacted June 30, 1879

(21 Stat. 43, § 2) and is now section 276 of the Judicial Code (U.S.C.A., Title 28, § 412). The meaning of all this is plain, and we think indicates the correctness of our interpretation.

The draftsmen of 1789 had still in mind the ancient conception of the voice of the country as an essence of the jury system. So they qualified the great inconvenience by providing that twelve neighbors should be (like Mohammed) brought to the defendant if the government found it greatly inconvenient for him to go or rather stay among them. Yet inconsistently and confusedly these same draftsmen provided for an impartial jury to be drawn.

Later this inconsistency and this confusion was realized. The twelve neighbors were removed from the statute and we have the modern system. How far the neighborhood has been abandoned appears from the fact that even if the trial were held in Burlington county the jurors not only could but must be drawn from other parts of the district. United States v. Merchants' & Miners' Transp. Co. (C.C.) 187 F. 355; Jarl v. United States (C.C.A.) 19 F.(2d) 891; United States v. Chaires (C.C.) 40 F. 820; United States v. Price (D.C.N.Y.1810) Fed. Cas.No.16,088. The common repute, except as serving in the (good or bad) character rule (Wigmore on Evidence, vol. 1, § 55, p. 122), is gone; only the material hardship to defendant remains.

■ The facts of inconvenience offered by the United States are quite simple and are not, we think, disputed. The government, as a matter of fact, made no claim of a housing shortage. The defendants did not, however, await their action in that regard, but presented us with the following resolution of the Burlington county freeholders:

"Whereas, Ellis Parker, Chief of Burlington County Detectives has requested the use of the Court Room and facilities in the Burlington County Court House for the purpose of holding a trial for the Federal Courts therein, now, therefore, be it

"Resolved, by the Board of Chosen Freeholders of the County of Burlington that permission be granted to the proper officials of the United States of America, Counsel for Ellis Parker and others to use the Court Room and facilities in the Burlington County Court House aforesaid for the trial of certain indictments against the said Ellis Parker and Others." (Petitioners' Exhibit No. 2.)

The claim not having been made, the resolution seems, legally at least, irrelevant.

The United States bases its contention of inconvenience on a principal and quite natural factor. It is the availability of the witnesses. They say, speaking through one of the Assistant United States Attorneys, that about 85 per cent. of the sixty witnesses the government expects to call live or at the time of the trial will be in the vicinity of Newark. This they declare arises from the fact that all but one of the overt acts are charged to have taken place in the boroughs of Brooklyn and Manhattan in the state of New York. The government further says that two of its principal witnesses will, at the time of the trial, be incarcerated in some place in New York state, nearer to Newark than to Mt. Holly, and that it will under the required procedure be necessary to return them each night to their said place of incarceration. The superior availability of Newark for the United States witnesses seems to us to be sound ground for the exercise of our admitted discretion. We accordingly exercise it to declare that the government has shown that the exception in the statute, rather than the statute itself, applies. We say the government has shown because in our view the convenience or inconvenience of the defendants is not in issue. We have touched upon one phase of such possible inconvenience, namely, expense, in discussing the current disappearance of the conditions existing at the time of the statute's original enactment. Only so is it pertinent, the fact being that defendants have a right quite apart from their convenience unless the United States satisfies their burden under the statute and proves great inconvenience. This, as we have said, we think they have done.

■ If, however, we are wrong in the actual exercise of our discretion, we still consider the application therefore untimely. On February 9, 1937, the defendants were brought into court for pleading. The stenographic record then taken shows the following:

"Mr. Quinn: If your honor please, I would suggest at this time that the middle of April be fixed for trial.

"The Court: April 19th.

"Mr. Quinn: Do counsel have any objection?

"Mr. Davis: No, thats all right.

"The Court: April 19th, that is Monday, will be fixed."

It is true that this colloquy shows no specific declaration on the part of the United States Attorney that he would move the case at Newark. The statute under which our terms of court are fixed provides for a term at Newark and for a term nowhere else on or about April 19th, the time expressly designated. U.S.C.A. Title 28, § 176. Furthermore, the newspapers of the state under date of January 23, 1937, carried the assignment of dates and judges for criminal cases beginning February 1st. This assignment list shows that our colleague Judge Fake is the only judge hearing criminal cases on April 19th and is designated to sit in Newark. In that posture it is our view that the defendants' counsel cannot pass over in silence the United States Attorney's declaration of a definite date without inquiring of him about the place. If the District Attorney had refused to answer such a question, that would be another matter. The question not having been put, it is our opinion that the failure to put it 58 days before the present application constitutes a waiver of the defendants right to be tried in Burlington county. The privilege, being, as we have seen, personal, can be waived. Ency.Pl. & Pr., vol. 22, p. 815.

In conclusion, two other matters deserve brief mention. We have spoken of the overt acts which concededly govern venue in conspiracy cases, a theory which incidentally sharply outlines the unreality of this whole procedure. It is a fact that the overt act most specifically expressed is laid in Burlington county. Overt Act No. 6, however, alleges a transportation by motor from Brooklyn to Burlington county. The kidnapped person could, of course (unless blindfolded), have advised the government of the counties through which the transportation (and hence the overt acts) was had. This not having been done, or at least the indictment not disclosing that it had been done, we are perhaps left to reasonable intendment. Would that require a holding that Burlington county was reached by placing the motor used on a boat or by encirclement of the state, rather than by road through Essex county. We leave the question open for the solution of the realists, rather than those required to pass upon the niceties of criminal pleading.

At the argument the original application was amended to include a demand for a fixation of the venue at either Trenton or Camden as the statute relied upon uses the word county and as neither Trenton nor Camden appear to be in Burlington county, the amendment deserves, in our opinion, no consideration. The defendants are invoking the application of a statute and they must abide by its terms. If they desire a change of venue, rather than the fixing a particular place of trial, they have other remedies dependent upon other considerations. These considerations are, as is known, such matters, local prejudice and the like, as make a fair trial at a particular place impossible. This court would be the first to act upon such a showing were it to be made. It is not even attempted.

So much for the legal and factual questions involved in the present application. One more matter requires mention. The application was argued on Thursday, April 8, 1937, from 10:30 until 1:45. At the conclusion of the argument we advised counsel that we would file our opinion on Monday, April 12th. At 11:15 on that morning one of the counsel for the defendants appeared in our courtroom during the hearing of the usual Monday morning motions and asked us if we had filed our opinion. We advised him that the opinion had been written and was in the course of transcription by our secretary. He then requested us to indicate our decision. We replied to the effect that we hoped that the decision would appear clearly in the opinion.

At or about 4:30 of the same afternoon we were advised by Mr. Quinn, the United States Attorney, that he had been notified of an appeal from the refusal of our colleague Judge Forman to enjoin the United States Attorney from prosecuting the trial of the defendants at Newark. Mr. Quinn advised us that the appeal was to be argued before and at the house of the Honorable J. Whitaker Thompson, one of the judges of the Circuit Court of Appeals for the Third Circuit at 11 o'clock on the morning of April 13th. The bill for an injunction referred to was presented to Judge Forman on the afternoon of Monday, April 5th, without notice to the United States Attorney, the day before the original presentation of the present application to ourselves.

Out of respect for the learned Circuit Court of Appeals and the judges thereof, we refrained from filing our opinion until we should have an opportunity to examine such order as it might be the pleasure of such judge to enter. We have now examined that order and find that the ordering part

reads as follows: "Ordered that John J. Quinn individually and as United States Attorney and his representatives, are hereby restrained from moving the trial of the indictment against the complainants-appellants at the City of Newark, New Jersey on April 19th, 1937, or on any adjourned date until the further order of this Court." Inasmuch as no reference to ourselves or to our decision of the pending application is made by the learned judge, we conceive that it is our duty to decide the same and we accordingly do so.

The application is denied.

## On Motion for a Bill of Particulars.

This opinion is the result of our third week-end devoted to a consideration of the legally expressed wishes of the defendants in the above-entitled cause. For the third time we are constrained to record our refusal of those wishes. The demand this time is for a bill of particulars. That demand comprises 177 specific questions. To classify them for approval or rejection is of itself a complicated matter, made more so, we might say, by the manner of their arrangement which seems to involve considerable duplication.

The indictment charges: (1) A conspiracy; (2) a seizure of the victim, Wendel, in the borough of Manhattan; (3) a carrying of Wendel to Brooklyn; (4) a holding in Brooklyn; (5) a torturing in Brooklyn; (6) a forced confession in Brooklyn; (7) a transportation to Burlington county in New Jersey; (8) and a holding in Burlington county. The demands for particulars asks us to require the government to fill in certain details of that story. We were surprised to find how far a reading of the indictment itself would have supplied them. Let us appraise those that are omitted, and in such appraisal let us follow the order of the indictment.

Omitted and asked for:

(1) The exact time and terms of the conspiracy.

(2) The exact spot in East Thirty-Second street and the exact method of seizure.

(3) The exact route followed in conveying Wendel from East Thirty-Second street to 3041 Voorhees avenue, Brooklyn, and the exact method of transportation.

(4) Nothing omitted.

(5) Nothing omitted.

(6) Nothing omitted.

(7) The exact route and means followed in conveying Wendel from 3041 Voorhees avenue in Brooklyn, to Mt. Holly and the New Jersey State Colony for Feeble-Minded Males in Burlington county and the ownership description of the motorcars used in such conveyance.

(8) The exact building used and guard employed in holding Wendel in Burlington county.

Our use of the adjective "exact" is, we think, sufficiently demonstrative of the unsoundness of the defendants' demands. They must not be surprised, but they must not entrap the government by an insistence on indifferent detail.

One considerable group of demands depends for its validity on a question quite dehors the surprise of the defendants. Assuming that the government in the indictment concedes the necessity for a material motive for a kidnapping (i. e., spite or the desire to help a friend would not qualify), it need only prove the motive and need not prove its realization. By the same token, the details of such realization need neither be alleged (as they are here) nor a fortiori proved. This disposes of the demands for such meticula as the magazines in which the defendants were to exploit, it is alleged, their solution of the Lindbergh kidnapping.

Apart from the considerations above discussed, such demands as use the words in detail or purposes, reasons, etc., are obviously unallowable. By way of illustration we set forth some typical demands coming within either the letter or spirit of this last observation.

"6. State fully and clearly, the terms of the alleged conspiracy. Also set out the purposes of the agreement, the means agreed to be used and all the terms thereof, when and where stated, by whom and to whom and in whose presence. State exactly what was said."

"9m. Set out in detail any and all matters that were stated, when and where, and by whom and to whom, and in whose presence, in reference to the obtaining 'ransom reward and otherwise.'"

"14a. How was the purpose to hold Wendel in Burlington County signified?"

"34. How would Overt Act No. 2 effect the object·of the alleged conspiracy?"

"50. How did the defendants not named in the allegations of Overt Act No. 5 instigate Overt Act No. 5?"

·"53. What is the relationship, if any, of the confession referred to in Overt Act No. 5 to the confession referred to in Overt Act No. 4?"

·"63. For what reason or reasons did Paul H. Wendel accompany the defendants named in Overt Act No. 6 to Burlington County?"

█ At the time of the argument we asked counsel if they could cite us to authorities which would justify us in granting any or all of their demands. It was their assertion that the discretionary character of the action sought accounted for the absence of such authorities. We agree as to our discretion. Wong Tai v. U. S., 273 U.S. 77, 47 S.Ct. 300, 71 L. Ed. 545; Wainer v. U. S., 82 F.(2d) 305 (C.C.A.). We do not agree as to the scarcity of the precedents. The cases are collected in ☞ 121 of the heading Indictment and Information in the·Federal Digest, vol. 8·and supplements.

A not even exhaustive examination of that section disclosed eighteen cases passing upon demands for particulars in conspiracy cases alone. It would seem, therefore, that counsel had often, at least, complained of an abuse of discretion. We·emphasize "complained" because in nearly every instance the appellate court found the complaint 'to be without justification and the trial 'judge to have exercised his discretion wisely. So in a very recent case under the statute here involved we find the Circuit Court of Appeals of the Eighth Circuit saying:

"The granting or the refusal of a motion for a bill of particulars is a matter that is governed· by the sound judicial discretion of the trial court, and unless it shall be shown affirmatively that such discretion has been abused by the trial court a refusal to require a bill of particulars will not be disturbed by an appellate court. Peck v. United States (C. C.A.) 65 F.(2d) 59; Bedell v. United States (C.C.A.) 78 F.(2d) 358, 362; Rubio v. United States (C.C.A.) 22 F.(2d) 766; Olmstead v. United States (C.C.A.) 19 F.(2d) 842, 844, 53 A.L.R. 1472.

"In the last analysis, well-nigh half of the forty-two items of requested·particulars were demands that'the·government be compelled to furnish to appellant statements of the witnesses· and copies of the evidence, by which it purposed proving each of the allegations of the indictment. The obtention of evidence in·the hands of an adverse party is not the function or office of a bill of particulars. Olmstead v. United States, supra; Rubio v. United States, supra."

Harry Sawyer v. United States, 89 F. (2d) 139.

The motion for a bill of particulars is denied.