## ROBINSON v. UNITED STATES.

No. 514.   Argued February 8, 1945.—Decided March 5, 1945.

*Mr. Robert E. Hogan* for petitioner.

*Mr. Edward J. Ennis,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark, Messrs. W. Marvin Smith, Robert S. Erdahl,* and *Miss Beatrice Rosenberg* were on the brief, for the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner was indicted and convicted in a District Court for violating the Federal Kidnapping Act, 47 Stat. 326, 48 Stat. 781, by transporting in interstate commerce a person whom he had kidnapped and held for a reward. The jury recommended and the court imposed the death penalty.   The Circuit Court of Appeals affirmed, 144 F.

2d 392. We granted certiorari limited to the sole question of the court's statutory authority to impose the death sentence.

The Act authorizes the death sentence when recommended by a jury "provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnapped person has been liberated unharmed." The indictment charged, and there was evidence before the jury, to the effect that the kidnapping victim yielded to capture only after the petitioner had twice violently struck her on the head with an iron bar; that while held in custody her lips were abrased and made swollen by repeated applications of tape on her mouth; and that wounds resulting from these assaults were not healed when she was liberated after six days' captivity. No evidence was introduced, nor did the indictment charge, that the injuries inflicted were permanent, or that the victim still suffered from them when the petitioner was sentenced, nine years after commission of the offense.[1] The trial court charged the jury that in determining whether the victim had been "liberated unharmed" they were limited to a consideration of her condition at the time she was liberated, and that they were not authorized to recommend the death penalty if at the time of her liberation she had recovered from her injuries. Petitioner took no exception to the charge, and asked no other. Its correctness is before us only to the extent that we are asked to say that the injuries inflicted must be permanent or they must be in existence at the time of sentence in order to authorize the infliction of the death sentence.

The scant legislative history of the Act is of little assistance to us in interpreting this proviso. Two possible rea-

---

[1] Petitioner pleaded guilty to the offense in 1936. In August, 1943, a district court held his plea of guilty invalid on the ground that he had been denied counsel. This appeal is from a trial which took place in October, 1943. See *Robinson* v. *Johnston*, 118 F. 2d 998; 316 U. S. 649; 130 F. 2d 202; 50 F. Supp. 774.

sons suggest themselves, however, as to the motivation of Congress in making the severity of a kidnapper's punishment depend upon whether his victim has been injured. The first reason is the old belief that the severity of the injury should measure the rigor of the punishment. If this be the reasoning implicit in the statute, it would appear that Congress intended that for a kidnapper to obtain the benefit of the proviso he must both liberate and refrain from injuring his victim. Congress may equally have intended this provision as a deterrent, on the theory that kidnappers would be less likely to inflict violence upon their victims if they knew that such abstention would save them from the death penalty. This assumption finds some slight support in the legislative history,[2] is not contested by the government, has been accepted in one case [3] and is the chief prop for the interpretation which the petitioner urges. He argues upon this assumption that the wider the scope of the exemption from the death penalty, the greater the inducement for the kidnapper to release the victim. To magnify the inducement, we are asked to interpret the proviso as granting immunity from the death sentence to any kidnapper who does not permanently injure his victim. We cannot ex-

---

[2] When the original kidnapping bill was passed by the Senate it did not provide for a death penalty. The House Committee on the Judiciary reported it to the floor with an amendment which authorized a death penalty unless the jury recommended mercy. 75 Cong. Rec., Part 12, 13294. Considerable opposition to the death sentence developed in the ensuing debate. *Ib.* pp. 13282–13304. Some of the opposition rested on the argument that the death penalty would cause kidnappers to kill their victims rather than release them because of fear that a liberated victim could send a kidnapper to the electric chair. *Ib.* pp. 13285, 13304. The bill as passed did not authorize the death penalty, 47 Stat. 326. Two years later an amendment was passed containing the present proviso. 48 Stat. 781. Its legislative history throws no additional light on its purpose.

[3] *United States* v. *Parker,* 19 F. Supp. 450, 103 F. 2d 857.

pand the meaning of the statute on such a hypothesis and we turn to its language.

We accept the word "unharmed" appearing in the proviso as meaning uninjured. Neither the word "permanent" nor any other word susceptible of that meaning was used by Congress. The quality of the injury to which Congress referred is not defined. It may be possible that some types of injury would be of such trifling nature as to be excluded from the category of injuries which Congress had in mind. We need indulge in no speculation in regard to such a category. The injuries inflicted upon this victim were of such degree that they can not be read out of the Act's scope without contracting it to the point where almost all injuries would be excluded. We find no justification whatever for grafting the word "permanent" onto the language which Congress adopted.

Nor can we construe the proviso as precluding the death sentence where the kidnapped person's injuries have been healed at the time sentence is imposed. It is not to be assumed that Congress intended a matter of such grave consequence to defendants and the public to turn on the fortuitous circumstance of the length of time that a case is pending in the courts. Far too many contingencies are involved, for example, the time it takes to apprehend a criminal, the condition of the trial docket, and the uncertainties of appeals. We would long hesitate before interpreting the Act so as to make the severity of sentence turn upon the date sentence is ultimately imposed, even if the language of the Act more readily lent itself to such a construction than this one does. At the very least, the proviso's language must mean that the kidnapped person shall not be suffering from injuries when liberated; the kidnapped person here was still suffering from her injuries when liberated.

Nevertheless it is argued that the death penalty proviso should be held invalid on the ground that there is uncer-

tainty as to the precise meaning and scope of the word "unharmed" and the phrase "liberated unharmed." In most English words and phrases there lurk uncertainties. The language Congress used in this Act presents no exception to this general truth. One thing about this Act is not uncertain, and that is the clear purpose of Congress to authorize juries to recommend and judges to inflict the death penalty, under certain circumstances, for kidnappers who harmed their victims. And we cannot doubt that a kidnapper who violently struck the head of his victim with an iron bar, as evidence showed that this petitioner did, comes within the group Congress had in mind. This purpose to authorize a death penalty is clear even though Congress did not unmistakably mark some boundary between a pin prick and a permanently mutilated body. It is for Congress and not for us to decide whether it is wise public policy to inflict the death penalty at all. We do not know what provision of law, Constitutional or statutory, gives us power wholly to nullify the clearly expressed purpose of Congress to authorize the death penalty because of a doubt as to the precise congressional purpose in regard to hypothetical cases that may never arise.

The trial court committed no error of which this petitioner can complain.

*Affirmed.*

Mr. Justice Rutledge, dissenting.

The penalty of death should not be imposed upon conditions defined so uncertainly that their identity cannot be ascertained or is left open to grave doubt. If words ever need to be clear, they do when they perform this function. I do not know what Congress meant when it commanded that "the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnapped person has been liberated unharmed." 48 Stat. 781.

The words have the sound of certainty which simple, everyday language gives forth. The certainty is only illusion. What does "liberated unharmed" mean? The statute does not tell us. Nor does the legislative history.[1] Neither does the Court's opinion. It rather demonstrates the statute's ambiguity. It does not say what Congress meant. It says only that Congress meant one of two things, and either would cover this case.[2] A third possible construction, put forward by petitioner, is rejected. The statute, it is held, does not mean that the death penalty can be imposed only when the injuries inflicted are permanent or, presumably, only when they remain at the time of sentence, though not permanent. The Court does not say what "liberated" means. Nor does it define "unharmed," except that it excludes the injury inflicted in this case.

What act is pointed to by "liberated"? Does it refer only to release by the kidnapper or does it include a case of rescue overcoming his will and purpose? Does it cover his abandonment of the victim in flight, leaving him perhaps gagged and bound in some lonely spot or cell, not free but no longer in the kidnapper's power? Or must he, before the pressures become too great, change his mind, exercise discretion and set the victim free before he is forced to do so?

Similarly, what is "unharmed"? A scratch, a cut, abrasions left by removal of tape or rope, bruises, nervous

---

[1] The Government's brief candidly states: "The interpretation of the proviso here involved must be determined from the face of the statute itself since neither the legislative history nor prior state legislation offers guidance." No hearings were held on the 1934 amendments, providing for the death penalty. They were accepted upon conference reports by both houses without debate. H. Rep. No. 1595, 73d Cong., 2d Sess.; 78 Cong. Rec. 8775, 8856–8857. Neither H. Rep. No. 1595 nor H. Rep. No. 1457, 73d Cong., 2d Sess., gives light on the meaning of the limitation.

[2] Cf. note 3.

shock, disturbance of digestion, all of a kind which heals or passes before "liberation" occurs? Few kidnappings take place without harm of some kind to the victim. They may be executed by force or by mere threats. One produces traumatic injury, from minor abrasion to death, the other nervous or mental shock of momentary or lifetime duration. How much injury, and what kind, did Congress have in mind?

Is the death penalty to be imposed for the identical cut or abrasion, whether minor or serious, inflicted during the act of taking the victim, merely because in one case the kidnapper releases or abandons him quickly, perhaps because forced to do so, but forbidden in another because he holds the victim until the injury heals? Is reward thus to be given for prolonging the agony?

Is the jury to range throughout the category of human ills, not only to find that injury has been inflicted but to evaluate whether those ills are "injuries" within the meaning of the statute? Or is this a question of law to be determined by the judge upon some vague criterion of "trifling nature" such as the opinion appears to suggest? Whether Congress meant all injuries, slight, substantial, serious or permanent, or only some of these, the statute does not say and the legislative history gives no guide. The judge, or the jury, or both together not only must apply, they must determine and write the law in this respect, until at any rate this Court, equally without legislative guidance, tells them what Congress had in mind.

There are still other uncertainties. Was it the intent (1) that the kidnapper must both liberate and refrain from injuring his victim or (2) merely that he must not inflict harm, however the liberation may occur? We are not told what was Congress' purpose, whether to measure the rigor of the punishment by the severity of the injury or to induce kidnappers not to use violence at all, deter-

ring them by the threat of death for its use in whatever degree.[3]   Neither the legislative history nor the opinion gives light on this question.   If Congress wished to induce gentle kidnappings, injuries inflicted in the course of the act of kidnapping are covered, provided they remain at the time of "liberation."   They would not be included, if healed before it, however grave when inflicted or however distant liberation from infliction.   What if the kidnapper, knowing that time is crucial, keeps his victim until the injuries are healed?   Was it Congress' purpose to induce longer detention, the more serious the injury inflicted during the original act?   What if it is inflicted afterward, but during the course of the detention?   Once injury has taken place, the inducement held out by the statute necessarily is either to hold the victim until cure is effected or to do away with him so that evidence, both of the injury and of the kidnapping, is destroyed.[4]   The more serious

---

[3] At one point the opinion declines to express a choice between these possible alternatives.   At another it states "the clear purpose of Congress" was to authorize "the death penalty, under certain circumstances, for kidnappers who harmed their victims."   Is this to be taken as deciding that "liberated unharmed" means "liberated not having been harmed at all"?   If so, the Court's view differs from the Government's, which is that the words mean "unharmed at the time of liberation."   Cf. note 5.   Moreover, the opinion, if so effective, invites for the victim the very danger Congress sought to avoid by placing the limitation upon the power to impose the sentence.

[4] These considerations for the safety of the victim, recently dramatized by the Lindbergh case, were influential in bringing about the omission from the original Kidnapping Act of 1932 (47 Stat. 326) of any provision for the death penalty.   Representative Celler stated them thus:

"If you insist upon the death penalty, I wager that you will inflict a penalty on the victim who is kidnapped.   The victim may be murdered or slain because the prisoner [sic] has nothing to gain by the victim being kept alive, because he forfeits his own life, in any event. . . .   The person kidnapped is the witness who, even when

the injury the stronger these inducements. It is only upon such considerations, affecting the victim's safety, that Congress' qualification of the power to impose the sentence of death can be accounted for.[5]

Finally, was Congress attempting to offer the maximum inducement to liberation? If this was the purpose, petitioner's construction, rejected by the Court, has more force than the other possible ones among which it declines to choose. For in that event the kidnapper would have inducement, once injury is inflicted, though serious, to

---

rescued, can always point the accusing finger at the guilty. Doing away with the victim would save the life of the guilty." 75 Cong. Rec. 13285. See 75 Cong. Rec. 13282–13304 for other statements opposing the extreme penalty.

From the viewpoint of possible effectiveness in securing the victim's safety, the qualification imposed by the 1934 Act would seem to be directed more toward the kinds of danger Congress had in mind during the 1932 debate than toward preventing all use of force in the kidnapping act itself. Cf. note 5 and *United States* v. *Parker*, 19 F. Supp. 450, affirmed, 103 F. 2d 857, cert. denied, 307 U. S. 642.

[5] The Government has urged adoption of the construction which takes account of these considerations. The brief states:

"The words 'liberated unharmed' . . . are subject to two interpretations. They may be construed to mean liberated without having been harmed at any time in the course of detention, or . . . liberated in an unharmed condition at the time of liberation. The first construction attributes to Congress the intention to cause kidnappers not to harm the victim but without tending to secure liberation of a victim who has been harmed. The second construction offers the kidnapper an inducement, in addition to the inducement not to harm, to care for and to cure an injured victim so that he may be unharmed when liberated. The second construction encourages kidnappers not to murder an injured victim, an inducement not present under the first construction. *In view of the temptation to kidnappers to murder their victims in order to dispose of witnesses to their crime, and in view of the interest disclosed in Congress to avoid a death penalty provision which would encourage this result,* the Government submits that the second construction *more properly reflects the intention of Congress* and should be adopted." (Emphasis added.)

surrender the victim in the hope that care after surrender might bring about cure before imposition of sentence. If the single and vague word "unharmed" is construed to mean absence of permanent injury or grave injury, though not permanent, he would have the hope, the inducement that surrender might give escape from the maximum sentence. Contrary to the Court's view that this interpretation is impossible, it goes directly to the unanswered questions, how much and what kinds of injury Congress had in mind; and to adopt it would accord with the rule that criminal statutes should be strictly construed. Moreover it would apply in this case, since there is no evidence of permanent injury or even that the injuries inflicted were critical at the time of the victim's release. She testified at the trial.

It is true this construction would make imposition of that penalty depend upon fortuitous circumstances, the length of time between release and sentence, as well as the chances of the victim to recover and their successful working out in that period. But any other construction either makes it depend upon circumstances equally fortuitous or has the inevitable effect, in many cases, of holding out inducement to the kidnapper to inflict the ultimate harm rather than to refrain from inflicting harm at all. Petitioner's construction more than any other takes into account the victim's safe surrender. Once the victim is hurt, the kidnapper's problem of what to do with him becomes inescapable and the provision for the extreme penalty can work only to defeat or defer liberation. Was this what Congress intended, knowing that few kidnappings can occur in which some substantial harm will not be done?

I doubt that Congress intended these consequences. I do not know from its words what it did intend. The opinion does not enlighten me, except that this case is one of possibly many, vaguely indicated, which may have been in mind. Congress has broad power to prescribe

penalties for crime, including death. It may give wide discretion to courts in selecting from a broad range of defined penalties to fit the individual case. Within limits this discretion may include the death penalty.

It is one thing, however, for Congress to confer the discretion confined by specified and ascertainable limits. It is another thing for Congress itself to turn the exercise of the conferred discretion upon conditions which cannot be ascertained from its mandate or can be located only with the greatest uncertainty.

Two things are clear. Congress did not intend the death penalty to apply to all convictions under the statute. Nor was its imposition intended to rest absolutely or exclusively either upon the jury's recommendation or in the court's discretion. The purpose obviously was to forbid it in some cases. But these can be determined only by choice among conflicting inferences which set one purpose Congress may have had in mind at war with others equally attributable to it.

This case involves the law's extreme penalty. That penalty should not rest on doubtful command or vague and uncertain conditions. The words used here, for its imposition, are too general and unprecise, the purposes Congress had in using them too obscure and contradictory, the consequences of applying them are too capricious, whether for the victim or for the kidnapper, to permit their giving foundation for exercise of the power of life and death over the citizen, though he be a convicted criminal. Other penalties might be rectified with time, if wrong. This one cannot be.

Moreover, the Court's refusal to resolve the statute's admitted ambiguity leaves hanging over the heads of future victims the danger which flows from "a death penalty provision which would encourage" the same irreparable fate for them. When that fate falls it will not be "hypothetical" and there will be nothing either we or Congress can do to revoke it.

I think the statute turns the power to impose the death penalty upon facts so vaguely defined that only judicial legislation can remedy the defect. This is not the kind of thing courts should be left to work out case by case through the "gradual process of inclusion and exclusion." This business rather belongs to Congress, not to the courts. As the Court's opinion states, though I think in contradiction of its judgment, "It is for Congress and not for us to decide whether it is wise public policy to inflict the death penalty at all." Congress' mandate in such matters must be clear; otherwise we, not Congress, decide. In this one it is beyond understanding.

I would vacate the judgment and remand the cause for the petitioner to be resentenced.

Mr. Justice Murphy joins in this opinion.