*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EXCLUSIVE CAPITAL PARTNERS, LLC,

        Plaintiff-Appellant,

v

CITY OF ROYAL OAK,

        Defendant-Appellee.

FOR PUBLICATION
December 04, 2024
3:22 PM

No. 366247
Oakland Circuit Court
LC No. 2022-193015-CZ

---

QUALITY ROOTS, INC.,

        Plaintiff-Appellant,

v

CITY OF ROYAL OAK,

        Defendant-Appellee,

and

PGSH HOLDINGS, LLC,

        Intervening Defendant-Appellee.

No. 366257
Oakland Circuit Court
LC No. 2022-192383-CZ

---

Before: BOONSTRA, P.J., and JANSEN and N. P. HOOD, JJ.

N. P. HOOD, J.

These consolidated appeals involve defendant, the city of Royal Oak's (the City), recreational marijuana ordinance. Plaintiffs, Exclusive Capital Partners, LLC (Exclusive), and Quality Roots, Inc. (Quality), appeal by right the separate December 2022 orders of the circuit court granting summary disposition in favor of the City under MCR 2.116(C)(8) and (C)(10) on plaintiffs' substantially identical claims challenging the award of marijuana retail licenses to other applicants.

In Docket No. 366247, Exclusive adopts the arguments of Quality's brief and also argues that the circuit court erred by dismissing its claim that the marijuana ordinance was void for vagueness. In Docket No. 366257, Quality asserts that the circuit court erred by granting summary disposition because (1) the marijuana ordinance is inconsistent with the Michigan Regulation and Taxation of Marihuana Act (MRTMA), MCL 333.27951 *et seq.*, school-buffer requirement, MCL 333.27959(3)(c); (2) the marijuana ordinance is inconsistent with the MRTMA's competitive-process requirement, MCL 333.27959(4), both facially and as applied; (3) the City violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*, because the City Commission delegated its governing authority to the city manager who selected licensees in closed-door meetings; (4) Quality sufficiently alleged and established a claim of substantive due process; (5) Quality sufficiently alleged and established that the marijuana ordinance was unconstitutionally vague; and, (6) injunctive relief was proper because invalidation of a license is a proper form of relief.

For the reasons later stated, we affirm the orders granting summary disposition except as they relate to the OMA issue. Regarding plaintiffs' OMA claims, the circuit court erred by granting summary disposition. We reverse and remand for proceedings to determine the appropriate remedy for the violations.

## I. BACKGROUND

### A. MRTMA

These cases occur against the backdrop of the MRTMA. We recently summarized the origins and relevant sections of the MRTMA in a similar case, *Yellow Tail Ventures, Inc v Berkley*, 344 Mich App 689, 693-695; 1 NW3d 860 (2022):

> Our Constitution permits the people of Michigan to bypass our Governor and Legislature and enact a statute by the citizen-driven initiative process. Const 1963, art 2, § 9. A statute enacted by initiative has the same force and effect as one passed the traditional way, with the exception that the initiated statute is not subject to gubernatorial veto and any amendment requires ¾ votes of both chambers of the Legislature. *Id.*

> For decades, it has been unlawful to manufacture, sell, or possess marijuana, under both federal and state criminal law. In November 2018, Michigan voters approved Proposition 18-1 by a vote of 2,356,422 to 1,859,675. As a result of this approval, it is now lawful to manufacture, sell, and possess marijuana under Michigan law, though it remains unlawful to engage in any of these activities under federal law.

> Proposition 18-1 became the [MRTMA]. (Note: The MRTMA uses the "marihuana" spelling; when we are not quoting the act, we use the more familiar "marijuana" spelling.) Section 2 of the act sets out the people's "purpose and intent" with respect to the MRTMA. These include the need "to control the commercial production and distribution of marihuana under a system that licenses, regulates, and taxes the businesses involved" and to "ensure security of marihuana establishments." MCL 333.27952. The people directed that, "[t]o the fullest extent

-2-

possible, this act shall be interpreted in accordance with the purpose and intent set forth in this section." *Id.*

Specifically with respect to the local regulation of marijuana, the MRTMA prohibits anyone from selling marijuana to the general public without first obtaining a local license. A municipality can "completely prohibit or limit the number" of marijuana establishments—including the number of retailers—that can operate within its boundaries. See MCL 333.27956(1). If a municipality permits marijuana establishments to operate within its geographical borders, then that municipality can adopt ordinances that, among other things, impose "reasonable restrictions on public signs" and "regulate the time, place, and manner of operation" of such establishments, so long as those ordinances "are not unreasonably impracticable" and do not conflict with the MRTMA or rules promulgated under the act. MCL 333.27956(2). And, if a municipality elects to limit the number of marijuana establishments, then that municipality must select its licensees "among competing applications by a competitive process intended to select applicants who are best suited to operate in compliance with this act within the municipality." MCL 333.27959(4).

Additionally, the MRTMA prohibits any marijuana establishment from being located within 1,000 feet of an existing public or private school providing education for kindergarten through 12th grade, "unless a municipality adopts an ordinance that reduces this distance requirement[.]" MCL 333.27959(3)(c).

## B. THE ROYAL OAK MARIJUANA ORDINANCE

Against the backdrop of the MRTMA, in July 2020, the City adopted a recreational marijuana ordinance, Royal Oak Ordinances, § 435 *et seq*. The marijuana ordinance authorizes all types of marijuana licenses allowed by the MRTMA, but limits the number of licenses available. See MCL 333.27959(2); Royal Oak Ordinances, § 435-2(B). With respect to retail licenses, relevant here, the marijuana ordinance limits the number of municipal licenses to two. See Royal Oak Ordinances, § 435-2(B)(5).

The marijuana ordinance grants the city manager "the power to fully and effectively implement and administer the municipal license application process." Royal Oak Ordinances, § 435-2(E). The ordinance directs that if more applications are received during the application window than licenses allowed, then "*the City shall decide among applications* by a competitive process intended to select the applicant(s) who are best suited to operate in compliance with the [MRTMA] within the City." Royal Oak Ordinances, § 435-4(C)(2) (emphasis added). Section 435-4(C)(4) of the marijuana ordinance sets forth a ranking process, directing that the applicants and their applications "will be ranked in the order of which is best suited to operate in compliance with the [MRTMA] within the City *as determined by the City Manager or his or her designee*." (Emphasis added.) Section 435-4(C)(4) further states that this ranking will be used to fill available license slots until all slots are filled, and mandates that 10 "competitive criteria" shall be used to meet this end: (1) the entire application and applicant's likelihood of success, (2) the applicant's tax history, (3) whether the applicant has previously operated a business within the

City, (4) whether the applicant has a history of criminal convictions, (5) whether the applicant has ever been denied any kind of commercial license, (6) whether the applicant has ever applied for bankruptcy, (7) whether the applicant has conducted any outreach on behalf of the proposed business, (8) whether the applicant has encouraged a successful workforce, (9) whether the applicant has taken steps to introduce equity into the proposed operation, (10) whether the applicant has proposed a plan incorporating sustainable infrastructure. See Royal Oak Ordinances, § 435-4(C)(4)(a) to (j).

If an applicant is awarded a municipal license through this competitive process, the applicant has five days to pay an application fee. See Royal Oak Ordinances, § 435-4(D)(2). Once the applicant pays the fee, the application is forwarded to various City departments for their approval. See Royal Oak Ordinances, § 435-4(D)(3). If the application is complete, the City Planning Commission considers the applicant's special-land-use permit and site plan and makes a recommendation to the City Commission for approval. See Royal Oak Ordinances, § 435-4(D)(4)(f) and (5). See also Royal Oak Ordinances, § 770-52.1(B) (amended zoning ordinance providing a mechanism to allow marijuana land uses in certain zoning districts as a special land use, which requires site-plan review and recommendation by the Planning Commission before a final decision by the City Commission). If the City Commission approves and all conditions are ultimately met, the City Clerk issues the license. See Royal Oak Ordinances, § 435-4(D)(7).

Additionally, the marijuana ordinance contains numerous "operational requirements" for license holders. See Royal Oak Ordinances, § 435-5(A). These are the requirements that licensees must abide by once operating. See *id.* Among these operational requirements, consistent with the MRTMA, is that "[n]o Marihuana Establishment shall be permitted within a 1,000-foot radius of any school." Royal Oak Ordinances, § 435-5(A)(5)(a).

Although the MRTMA allowed municipalities to opt out of the 1000-foot-buffer-zone requirement, the City initially did not reduce the requirement within the marijuana ordinance, but it adopted amendments to its zoning ordinance to allow such reduction on a case-by-case basis. At the time the City approved the recreational marijuana ordinance, it also approved amendments to its zoning ordinance that would accommodate marijuana land use as a special land use. See Royal Oak Ordinances, § 770-52.1(B). The zoning ordinance gave the City Commission discretion to deviate from the operational requirements of the ordinance as follows:

> Deviations from applicable setback, parking, and other requirements may be granted by the City Commission, provided there are features or elements demonstrated by an applicant and deemed adequate by the City Commission upon the recommendation of the Planning Commission that are designed into the site plan for purpose of achieving the objectives of this section. [Royal Oak Ordinances, § 770-52.1(B)(14)].

In other words, the City Commission could approve a reduction of the buffer-zone requirement for a given site plan, but only on the recommendation of the Planning Commission.

As later described in further detail, the City later amended its ordinances to give the City Commission authority to make such approval without a recommendation from the Planning Commission. We take judicial notice that while the appeal was pending, on June 26, 2023, the

City Commission approved amendments to the recreational marijuana ordinance. See Royal Oak Ordinance 2023-06 (June 26, 2023). The amendments to the marijuana ordinance were similar to provisions in the zoning ordinance, § 770-52.1(B)(14), which allowed deviation from the 1,000-foot-buffer requirement. The primary difference is that the amendments to the marijuana ordinance conferred authority to the City Commission, without recommendation from the Planning Commission.

## C. THE RETAIL LICENSE SELECTION PROCESS

The City accepted applications for retail licenses from December 7, 2020 through February 7, 2021. The city manager at the time, Paul Brake, received a total of 31 applications, including, respectively, from Quality and Exclusive.

In evaluating the applications, the city manager consulted with various municipal officers, in what he called a "workgroup." The workgroup included Todd Fenton—the deputy city manager and director of economic development, the city manager's assistant, the director of community development, the city planner, the city engineer, the chief of police, the city treasurer, and the city attorney. This workgroup met in closed session four times in August 2021 to help evaluate the applications.

Members of the workgroup provided the city manager input not only from their review of the applications, but also regarding matters pertinent to their particular expertise, such as land use, parking, or business development. The workgroup did not rank applicants, but rather assisted the city manager with narrowing down the applicants through a process of elimination by assessing the applications on the basis of the competitive criteria in the marijuana ordinance.

The meetings took place on August 4, August 11, August 18, and August 25, 2021. According to the city manager, there are no official notes or minutes of the meetings. Fenton, however, testified that the city manager's assistant compiled comments from the meetings. According to the city manager, assessment of the competitive criteria required a "qualitative analysis." While the competitive criteria are all "equally important" on the "surface," some criteria were allotted greater weight than others, and, while many of the criteria facially required yes-or-no answers, applicants could satisfy some criteria by varying degrees. According to Fenton, the workgroup did not compare applications or weigh criteria; instead, members discussed the degree to which certain criteria were satisfied. By the last meeting, members of the workgroup were asked to submit their opinions regarding which candidates were the best applicants.

After the last workgroup meeting in August, the city manager consulted individually with Fenton and the director of community development regarding the finalists, and then using a "qualitative" approach, individually came to the final decision for the two retail licenses. The city manager then categorized the remaining applicants as either "standby" or rejected, but did not numerically rank them. The city manager confirmed that he did not use any type of scoring rubric, and each of the criteria were weighed equally. Regarding the compliance criterion, the city manager testified that he considered which applicant was best suited to comply with the marijuana ordinance, not the MRTMA. He further stated that, although the process was collaborative, he

made the final selections himself. The city manager identified both plaintiffs in the standby category.

In December 2021, the City notified Quality that its application had not been selected for moving forward in the licensing process, but that the application would not be officially denied until the prospective licensees successfully completed the licensing process. Exclusive was also notified that it was on the standby list. Several days later, the City informed PGSH Holdings, LLC (Gatsby), and Royal Oak Treatment LLC (Royal Treatment) that the city manager chose them to receive retail licenses. Consistent with the marijuana ordinance, a hearing was scheduled before the City Planning Commission to consider its recommendation to the City Commission regarding these entities' special-land-use permits and site plans. That hearing was scheduled for February 8, 2022.

About a week before that hearing, Quality filed a complaint against the City, alleging due-process violations, OMA violations, and violations of the MRTMA's competitive-process and school-buffer requirements, given that Gatsby was located less than 1,000 feet from a K-12 public school, Oakland Schools Technical Campus Southeast (OSTC-SE). It is largely undisputed that Gatsby's site plan placed it approximately 88 feet from OSTC-SE. The complaint sought declaratory and injunctive relief preventing the City from issuing special-land-use permits and final authorization of licenses for Gatsby and Royal Treatment.

As scheduled, on February 8, 2022, the Planning Commission meeting proceeded after Gatsby and Royal Treatment had submitted applications for site-plan review and special-land-use permits under the City's zoning ordinance. The Planning Commission voted three to two to recommend denial of Gatsby's special land-use permit, and four to one to recommend approval of Royal Treatment's special-land-use permit. As later described in greater detail, the City Commission approved the special land use for Gatsby and Royal Treatment. In the case of Gatsby, the City Commission's approval was contrary to the Planning Commission's recommendation.

D. PROCEDURAL BACKGROUND

In March 2022, while the licensing process for Gatsby and Royal Treatment was still pending, the City moved for summary disposition in lieu of an answer regarding Quality's complaint. Around the same time, Exclusive filed its complaint, seeking, among other things, declaratory relief that the City failed to comply with its marijuana ordinance because a committee, not the city manager, had selected the successful applicants. It also sought declaratory relief regarding the alleged due-process violations, the alleged OMA violation, and the alleged MRTMA violation.

In April 2022, the circuit court consolidated the cases. The City then moved for summary disposition of Exclusive's complaint under MCR 2.116(C)(8) and (C)(10).

With both motions pending, on April 25, 2022, the City Commission approved the site plans and special-land-use permits for both Gatsby and Royal Treatment. The City issued the two retail licenses the next day. On May 18, 2022, the city manager informed Quality by letter that its license application was formally denied. Apparently, Exclusive did not learn that its application had been denied until August 1, 2022.

-6-

After the City issued the licenses, plaintiffs amended their complaints. The City filed new motions for summary disposition, which plaintiffs opposed. The circuit court considered each case separately at a December 2022 motion hearing. Regarding Quality's claims, the circuit court granted the City's motion, stating:

> [The City's] motion for summary disposition is granted pursuant to C-8 and C-10. The claim for violation of the [OMA] is dismissed as it is inapplicable to the facts of the case at bar pursuant to [*Herald Co v Bay City*, 463 Mich 111; 614 NW2d 873 (2000)] . . . . The various constitutional claims are dismissed pursuant to C-8 and C-10 pursuant to [*Pinebrook Warren, LLC v City of Warren*, 343 Mich App 127; 996 NW2d 754 (2022), rev'd __ Mich ___ (2024) (Docket Nos. 164869 through 164877) (*Pinebrook I*)].

> The claims regarding the city ordinance are dismissed pursuant to C-8 and C-10 insofar as the ordinance does not violate the statute. The statute requires municipalities to determine which entity is best suited to comply with the statute within the municipality, nor does the statute require certain variables to be given certain weight. The ordinance at issue does not violate the [MRTMA], and the claims are hereby dismissed as are the claims that the city manager violated the statute and ordinance.

> Likewise, the claims challenging the ordinance for vagueness are dismissed. The city manager was required to consider certain factors, which he testified were indeed considered.

> The ordinance does not infringe on [F]irst [A]mendment rights, does not prohibit certain conduct, and does not grant the finder of fact unfettered discretion. Thus, the ordinance is not void for vagueness.

> Next, the claims that the city manager violated the ordinance are dismissed. The city manager complied with the statute and the ordinance. The claims regarding this issue are dismissed pursuant to C-10.

> Lastly, the claim seeking injunctive relief is moot. As noted by [the City], the licenses have been issued to two non parties. The court cannot create a new license, nor can the court remove the licenses from the non parties. The claim for injunctive relief is dismissed as moot.

Exclusive then briefly addressed its void-for-vagueness claim, arguing that the marijuana ordinance was so vague as to give the city manager unfair discretion, and that the city manager's own deposition demonstrated that he did not know how to apply the marijuana ordinance. The circuit court again ruled in favor of the City:

> First, the claims that the city manager violated the ordinance are dismissed. . . . The claims regarding this issue are dismissed pursuant to (C) (10). Likewise, the claims challenging the ordinance for vagueness are dismissed. The city manager was required to consider certain factors which he testified were indeed considered.

-7-

The ordinance does not infringe on First Amendment rights, does not prohibit certain conduct, does not grant the finder of fact unfettered discretion. Thus, the ordinance is not void for vagueness. Further, Plaintiff's assertion that it was denied in appeal is without merit and moot. The various constitutional claims are dismissed pursuant to (C) (8) and (C) (10) pursuant to [*Pinebrook I*]The claims regarding the city ordinance are dismissed pursuant to (C)(8) and (C)(10) [insofar] as the ordinance does not violate the statute.

The statute requires municipalities to determine which entity is best suited to comply with the statute within the municipality nor does the statute require certain variables to be given certain weight. The ordinance at issue does not violate the MRTMA and the claims are hereby dismissed. As are the claims that the city manager violated the statute and the ordinance. [The City's] motion for summary disposition is granted pursuant to (C) (8) and (C) (10). The claim for violation of the Open Meetings Act is dismissed as it is inapplicable . . . . This is pursuant to [*Herald Co*, 463 Mich 111] and [*Pinebrook I*] . . . .

Thereafter, the circuit court entered orders consistent with its ruling from the bench.

Both plaintiffs moved for reconsideration, and the circuit court denied both motions. With the exception of the 1000-foot buffer requirement, the court concluded that both plaintiffs merely repeated the arguments of their original briefs. Regarding Quality's argument that the court had failed to rule on its claim that the City violated the 1,000-foot buffer requirement, the court reasoned as follows:

Plaintiff's motion for reconsideration essentially presents the same issues already ruled on by the Court. To the extent Plaintiff argues that the Court did not expressly address the argument that the City violated the school buffer zone required by the MRTMA, the Court addressed the issue when it . . . concluded that the City's licensing ordinance does not violate the MRTMA. In its motion for summary disposition, [the City] argued that MCL 333.27959(3) addresses only the obligations of the Michigan department of licensing and regulatory affairs and does not impose any obligation on [the City], and that the MRTMA authorizes the City to reduce the 1,000-foot buffer. Based on the plain language of the statute, Plaintiff has not demonstrated palpable error in the Court's decision.

The circuit court also found that because it had determined that the City complied with its marijuana ordinance and the MRTMA, Quality had failed to demonstrate any palpable error in the dismissal of the due-process claim.

Quality appeals by right in Docket No. 366257. Exclusive appeals by right in Docket No. 366247 and explicitly incorporates by reference the arguments Quality advances. We consolidated these appeals. See *Exclusive Capital Partners, LLC v Royal Oak*, unpublished order of the Court of Appeals, entered June 6, 2023 (Docket Nos. 366247 and 366257).

## II. STANDARDS OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. See *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In this case, the circuit court did not specify the subrule under which it dismissed Exclusive's claim, but MCR 2.116(C)(10) appears to be the proper subrule because the circuit court seems to have referenced facts outside the pleadings. Summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). Summary disposition is appropriate under (C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Sunshine v Delta College Bd of Trustees*, 343 Mich App 597, 601; 997 NW2d 755 (2022) (quotation marks and citation omitted). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citation omitted).

Interpretation of a municipal ordinance is also a question of law reviewed de novo. *McMillan v Douglas*, 322 Mich App 354, 357; 913 NW2d 336 (2017). This includes the constitutional question whether an ordinance is void for vagueness. *In re TEM*, 343 Mich App 171, 179-180; 996 NW2d 850 (2022). The rules applicable to the interpretation of a statute apply to the interpretation of an ordinance. See *id*. at 180. When interpreting an ordinance, we must discern the drafter's intent, which we accomplish by giving the words selected by the drafter their plain and ordinary meanings. See *id*. If an ordinance is unambiguous, it must be applied as plainly written. *See id*.

## III. VOID FOR VAGUENESS

The circuit court correctly granted summary disposition on plaintiffs' claims that the marijuana ordinance was void for vagueness and their related argument that it gave the city manager unfettered discretion.[1] Exclusive argues that the marijuana ordinance is unduly vague and therefore unconstitutional, giving the city manager inadequate standards or guidance for implementing a competitive process and leaving that officer with unrestrained discretionary power. We disagree.

"The 'void for vagueness' doctrine is derived from the constitutional guarantee that the state may not deprive a person of life, liberty, or property without due process of law." *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457, 467; 639 NW2d 332 (2001), citing US Const, Am XIV; Const 1963, art 1, § 17. " 'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.' " *People v Howell*, 396 Mich 16, 20 n 4;

---

[1] Quality also raises a constitutional vagueness argument. Most of its argument is devoted to rebutting the City's arguments. Quality has otherwise raised only a cursory argument, which ordinarily would be insufficient for this Court's consideration. See *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003). We nonetheless elect to address these claims as they overlap with Exclusive's vagueness claims.

238 NW2d 148 (1976), quoting *Grayned v City of Rockford*, 408 US 104, 108-109; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Vague laws implicate three related, core concerns:

> *First*, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. *Second*, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Third*, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." [*Grayned*, 408 US at 108-109 (quotation marks, citations, and alterations omitted).]

We have previously observed in other contexts, "[a] statute or ordinance may be void for vagueness if (1) it is overbroad and impinges on First Amendment freedoms, (2) it does not provide fair notice of the conduct it regulates, or (3) it gives the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated." *Yankee Springs Twp v Fox*, 264 Mich App 604, 606; 692 NW2d 728 (2004).

At the threshold, we reject the City's argument that the void-for-vagueness doctrine is inapplicable because Exclusive lacks a valid property interest as a first-time license applicant. The cases on which the City relies hold that a first-time license applicant does not possess a property interest, but none of those cases support the proposition that a first-time license applicant's void-for-vagueness challenge fails for lack of such interest.[2] At its core, the void-for-vagueness doctrine is concerned that laws provide fair notice and prevent arbitrary enforcement rather than with the deprivation of a claimant's property or liberty interests; the doctrine applies regardless of whether a property or liberty interest is clearly established.

---

[2] See, e.g., *Pinebrook I*, 343 Mich App at 160 ("a first-time applicant for a license cannot show that he or she has an entitlement to the license, the first-time applicant has no property interest in the issuance of the license"); *Cary Investments, LLC*, 342 Mich App at 316 ("a new applicant for a license has no property interest in any license to support a claim for deprivation of procedural due process"); *Wong v Riverview*, 126 Mich App 589, 593; 337 NW2d 589 (1983) (a "first-time applicant has no right to procedural due process"). Of note, the City discusses *In re TEM*, 343 Mich App at 180, in which this Court considered a vagueness challenge to the Adoption Code, MCL 710.21 *et seq*. This Court did address whether the petitioners held a protected property interest and concluded that they did not. *Id*. at 181-182. But *In re TEM*'s conclusion in this regard was not dispositive of the petitioners' vagueness claim, *id*. at 182-185, and thus the case does not indicate that the lack of an existing property interest is fatal to a vagueness claim.

We likewise reject the City's argument that the void-for-vagueness doctrine does not apply to a licensing scheme because the doctrine commonly applies in connection with penal laws or First Amendment rights. The single authority on which the City relies to support this argument, *Hackel v Macomb Co Comm*, 298 Mich App 311; 826 NW2d 753 (2012), recognized that courts have applied the void-for-vagueness doctrine in other contexts. *Id.* at 332.[3] And, while we are unaware of Michigan precedent applying the void-for-vagueness doctrine in the context of a first-time license applicant challenging a licensing scheme, we have applied the doctrine more broadly than criminal laws. See e.g., *In re TEM*, 343 Mich App at 180 (the Michigan Adoption Code); *Turunen v Dep't of Nat'l Resources*, 336 Mich App 468; 971 NW2d 20 (2021) (invasive species regulation); *Fox*, 264 Mich App at 604 (riparian-use regulation). Notably, the United States Supreme Court has applied the doctrine to a licensing ordinance. See *City of Mesquite v Aladdin's Castle*, 455 US 283, 291; 102 S Ct 1070; 71 L Ed 2d 152, 161 (1982). In short, the doctrine can apply to this sort of case.

But Exclusive's arguments fail. Exclusive contends that the marijuana ordinance is unconstitutionally vague because it is so lacking in standards as to grant the city manager unfettered discretion, and thus fails to put applicants on notice about how the ordinance is applied. "Vagueness challenges that do not involve a challenge to First Amendment freedoms are examined in light of the facts of the particular case." *STC, Inc v Dep't of Treasury*, 257 Mich App 528, 539; 669 NW2d 594 (2003). A statute or ordinance has a strong presumption of constitutionality, and the party challenging such law has the burden of overcoming that presumption. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 259 Mich App 315, 341; 675 NW2d 271 (2003). "In determining whether a statute is void for vagueness, the entire text of the statute is examined and the words of the statute are given their ordinary meanings." *STC, Inc*, 257 Mich App at 539. A "statute must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited or required." *Id*. A statute is unconstitutionally vague "where people of common intelligence must guess at the statute's meaning and differ with regard to how it applies." *City of Westland v Okopski*, 208 Mich App 66, 74; 527 NW2d 780 (1994). "When determining whether a statute inappropriately delegates unstructured and unlimited discretion to a decision maker, the court examines whether the statute provides standards for enforcing and administering the laws in order to ensure that enforcement is not arbitrary or discriminatory . . . ." *English v Blue Cross Blue Shield*, 263 Mich App 449, 469; 688 NW2d 523 (2004) (quotation marks and citation omitted).

Here, the marijuana ordinance charged the city manager with administering the application process for recreational marijuana licenses. See Royal Oak Ordinances, § 435-2(E). Although the

---

[3] *Hackel* involved a void-for-vagueness claim in relation to a county resolution governing the award of contracts. *Hackel*, 298 Mich App at 333. There, we held that the resolution did not fit "within the category of enactments against which a void-for-vagueness challenge is usually asserted," but did not expressly hold that the doctrine was limited to such contexts, and ultimately analyzed the challenged resolution and concluded it was not vague. *Id*. at 333-334. *Hackel*, in fact, recognized that the doctrine had been applied in other contexts. *Id*. at 332. The City otherwise cites no law indicating that claims of unconstitutional vagueness are inapplicable, as a matter of law, in the realm of municipal licensing schemes.

City was required to decide among applicants if the number of applications exceeded the available license slots, the ordinance dictated that the city manager "or his or her designee" was to rank the applicants "in the order of which is best suited to operate in compliance with the Act . . . ." Royal Oak Ordinances, § 435-4(C)(2) and (4). The ordinance provided that certain "competitive criteria" "shall be" used for that purpose, including the likelihood of success in harmony with surrounding properties along with the nine other aforementioned criteria that implicate an applicant's tax history, criminal history, financial history, operational history, and sustainability plains. See Royal Oak Ordinances, § 435-4(C)(4)(a) to (j).

The plain text of the ordinance illustrates that the city manager was not without guidelines, and the public was not without notice as to the ordinance's application. The ordinance undoubtedly allows the city manager some leeway and discretion in administering the licensing process. But it does not do so to the extent that it renders the ordinance constitutionally infirm. The "prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.' " *People v Petrella*, 424 Mich 221, 255; 380 NW2d 11 (1985) (alteration in the original), quoting *Robinson v United States*, 324 US 282, 286; 65 S Ct 666; 89 L Ed 944 (1945).

On appeal, Exclusive focuses on the city manager's purported "confusion" in implementing the ordinance. It relies on a statement in his deposition testimony about using "qualitative analysis" when the ordinance did not dictate one, and his declining to numerically rank applicants. Exclusive however cites no authority for the position that a city official's confusion, or interpretation, regarding the meaning of an ordinance he or she is charged with implementing itself establishes that the ordinance is unconstitutionally vague. Due process "does not preclude a city from giving vague or ambiguous directions to officials who are authorized to make . . . recommendations." *City of Mesquite*, 455 US at 291. The relevant inquiry is whether the ordinance is so lacking in standards as to give those charged with implementing it carte blanche to follow their personal predilections. This ordinance does not. Even assuming that the city manager was confused with respect to implementation of the ordinance's competitive process, this alleged fact, if established, would not necessarily indicate that the city manager acted with unbridled discretion.

Exclusive has failed to overcome its burden of demonstrating that the marijuana ordinance is unconstitutionally vague. Because no genuine issue of material fact exists concerning whether the marijuana ordinance is unconstitutionally vague, the circuit court did not err by granting the City summary disposition with respect to Exclusive's void-for-vagueness claim.

IV. 1000-FOOT SCHOOL-BUFFER REQUIREMENT UNDER MCL 333.27959(3)(c)

Quality's lead argument is that the City violated the MRTMA's school-buffer requirement, and the circuit court erred by failing to address this issue and denying summary disposition. Quality describes this issue as "the most simple and straightforward in these consolidated cases." It is actually the most convoluted. Ultimately, we conclude that the circuit court properly granted summary disposition in favor of the City because (1) the marijuana ordinance and general zoning scheme do not conflict with MCL 333.27959(3)(c) and (2) awarding the retail license to Gatsby did not violate the MRTMA's school-buffer requirement despite the close proximity to a school.

At the outset, we must clarify what exactly Quality is arguing and what it is not. It argues that the City violated the MRTMA. It does not argue that the City violated its own marijuana ordinance.

This is sensible because the City did not violate its ordinance by awarding Gatsby a retail license. None of the 10 competitive criteria for retail license applicants contained a school-buffer requirement. See Royal Oak Ordinances, § 435-4(C)(4)(a) to (j). In fact, nothing in Section 4, the section of the ordinance relating to applications, directly references a school-buffer requirement. See Royal Oak Ordinances, § 435-4.[4]

The marijuana ordinance, however, does contain a school-buffer requirement in Section 5, the section of the ordinance relating to *operations*. See Royal Oak Ordinances, § 435-5(A). As stated, consistent with the MRTMA, the ordinance provides, "[n]o Marihuana Establishment shall be permitted within a 1,000-foot radius of any school." Royal Oak Ordinances, § 435-5(A)(5)(a). Again, this is an operational requirement, not an application or licensing consideration. This means that an entity like Gatsby, whose proposed site was 88 feet from a school, might succeed in applying for a retail license, but be poised to violate the operational provisions of the ordinance. That is, unless the City Commission validly approved a deviation before it started operating.

For Gatsby, this means the City did not violate its ordinances when it awarded the City's retail license. We acknowledge that the marijuana ordinance requires the city manager to consider likelihood of success, which would implicate compliance with the MRTMA, including the school-buffer requirement. But both the MRTMA and the City's ordinances contemplated a reduction of that requirement. See MCL 333.27959(3) (recognizing that a municipality may adopt an ordinance that reduces the 1,000-foot buffer requirement). See also Royal Oak Ordinances, § 770-52.1(B)(14) (stating that the City Commission may deviate from zoning requirements upon recommendation of the City Planning Commission). To the extent that the city manager had to consider this as part of the competitive criteria, we accept that he could also consider the likelihood that the City Commission would eventually validly approve a deviation from the school-buffer requirement for Gatsby. See Royal Oak Ordinances, § 770-52.1(B)(14). And that is exactly what happened. The City Commission initially approved Gatsby's site plan, implicitly approving a deviation from the school-buffer requirement. To the extent that the initial deviation was invalid,[5]

---

[4] We acknowledge that one criterion potentially requires consideration of the applicant's ability to comply with the MRTMA. Cf. Royal Oak Ordinances, § 435-4(C)(4)(a). This implicitly would incorporate the 1,000-foot-buffer requirement in the MRTMA, assuming the City Commission did not validly waive the requirement. As we discuss, to the extent this application criterion incorporates the school-buffer requirement, the City's ability to waive it before the licensee begins to operate has the potential to nullify an such incorporation.

[5] As noted, both the marijuana ordinance and general ordinances included the buffer requirement. Royal Oak Ordinances, § 435-5(A)(5)(a) and § 770-52.1(B)(3). But § 770-52.1(B)(14) also allowed the City Commission to deviate from that requirement if the applicant showed that certain features had been designed into the plan and the City Commissions deemed them adequate "upon recommendation of the Planning Commission."

the City Commission amended its ordinance to allow it to validly deviate from the school-buffer requirement on June 26, 2023. Any operation after that point would not violate the statute.

To summarize, the City did not violate the statute by awarding a retail license to Gatsby. To the extent that Gatsby violated the statute by operating without a valid deviation, it was Gatsby's problem, not the City's. And it was a problem that was solved by June 2023 when the City Commission amended its ordinances to allow it to validly deviate from the buffer requirement without a recommendation from the Planning Commission.

Recall, however, Quality does not argue that the City violated its own ordinances. It argues that it violated the MRTMA because MCL 333.27956(3) prohibits municipalities from imposing licensure requirements that conflict with the act, MCL 333.27959(3)(c) requires a school-zone buffer of 1,000 feet unless a municipality has adopted an ordinance that reduces this distance, and the City has adopted no such ordinance. We disagree.

Quality effectively raises a conflict preemption claim, i.e., a claim that "a local regulation directly conflicts with state law." *Deruiter v Twp of Byron*, 505 Mich 130, 140; 949 NW2d 91 (2020). "Conflict preemption applies if the ordinance is in direct conflict with the state statutory scheme[.]" *Id*. at 140 (citation and quotation marks omitted). This analysis necessarily begins with an examination of the relevant provisions of the MRTMA and the marijuana ordinance.

MCL 333.27959(3) provides as follows:

> Except as otherwise provided in this section, the department shall approve a *state* license application and issue a state license if:
>
> * * *
>
> (c) the property where the proposed marihuana establishment is to be located is not within an area zoned exclusively for residential use and is not within

---

Again, Gatsby's proposed location was 88 feet from OSTC-SE, which the City did not dispute qualified as a public school for purposes of the City's ordinances. Under both the marijuana ordinance and the general zoning ordinance, then, Gatsby was prohibited from *operating* its marijuana facility at its proposed location. The City Commission, however, voted to approve the license, despite that the Planning Commission had voted to not recommend approval of Gatsby's application. The City Commission could approve the license. But because the City Commission's approval of the deviation from the buffer requirement in the absence of a recommendation from the Planning Commission, the City arguably violated § 770-52.1(B)(14). If the initial deviation was invalidly obtained under § 770-52.1(B)(14), Gatsby's operation likely violated the marijuana ordinance's operations provisions from the time it started operating until the later valid deviation following the amendments to the marijuana ordinance. This precise issue is not presently before us. We discuss it only to the extent that it is necessary for us to fully address Quality's argument.

-14-

1,000 feet of a pre-existing public or private school providing education in kinder-garten or any of grades 1 through 12, *unless a municipality adopts an ordinance that reduces this distance requirement*[.]  [Emphasis added.]

In other words, the MRTMA allows provision of a *state* license within 1,000 feet of a preexisting public or private grade school *only if* the municipality has adopted an ordinance that reduces this distance requirement.

The MRTMA also authorizes municipalities to adopt ordinances regulating recreational marijuana establishments within their boundaries and provides certain guidelines.  MCL 333.27956(3) provides that "[a] municipality may adopt an ordinance requiring a marihuana establishment with a physical location within the municipality to obtain a municipal license, *but may not impose qualifications for licensure that conflict with this act* or rules promulgated by the department."  (Emphasis added.)

Reading MCL 333.27956(3) and MCL 333.27959(3)(c) together, we discern two critical points: (1) the MRTMA does not require a municipality to adopt the buffer requirement as a qualification for municipal licensure because MCL 333.27956(3), by its plain language, requires it for state, not municipal, licenses, and (2) an ordinance reducing the buffer zone, as qualification for municipal licensure, would not conflict with the act because MCL 333.27959(3)(c) indicates that a municipality may adopt an ordinance reducing that buffer zone.

Our review of the City's ordinances applicable during the application process reveals no conflict with MCL 333.27959(3).  Section 435-5(A)(5)(a) of the marijuana ordinance stated as follows:

A.  A Marihuana Establishment issued a Municipal License under this Ordinance and operating in the City shall at all times comply with the following operational requirements, which the City may review and amend from time to time as it determines reasonable.

\* \* \*

5.  The following spacing requirements for Marihuana Establishments are required:

a. No Marihuana Establishment shall be permitted within a 1,000-foot radius of any school.

Additionally, the City's general ordinances included the provision, "No marihuana establishment shall be permitted within a 1,000-foot radius of any existing public or private school with a curriculum equivalent to kindergarten through 12th grade."  Royal Oak Ordinances, § 770-52.1(B)(3).  The plain text of these provisions illustrate that the City adopted the buffer requirement of MCL 333.27959(3)(c) even though the MRTMA did not require it for municipal licensing.

-15-

But, § 770-52.1(B)(14) of the Royal Oak Ordinances allowed for deviation from the ordinances' buffer requirements:

> Deviations from *applicable setback*, parking, and *other requirements* may be granted by the City Commission, provided there are features or elements demonstrated by an applicant and deemed adequate by the City Commission *upon the recommendation of the Planning Commission* that are designed into the site plan for purpose of achieving the objectives of this section. [Emphasis added.]

Thus, while deviation from the buffer requirement is permitted under § 770-52.1(B)(14) of the Royal Oak Ordinances, such a deviation may be granted only if the applicant shows that certain features have been designed into the plan, and that the City Commission deems them adequate "upon recommendation of the Planning Commission." *Id*. This provision allows the City to reduce the distance requirement of § 435-5(A)(5)(a) of the marijuana ordinance and § 770-52.1(B)(3) of the Royal Oak Ordinances.

Because the City adopted an ordinance allowing reduction of the buffer zone consistent with MCL 333.27965(3) and MCL 333.27959(3), the City's ordinances, on their face, do not conflict with the MRTMA. While MCL 333.27959(3)(c) does not require a municipality to adopt the buffer requirement, that statute indicates that a municipality may adopt an ordinance reducing the buffer requirement for purposes of state licensing. A review of the City's licensing and zoning scheme, which allows a reduction of the buffer zone, reveals no inherent incompatibility between the then-existing licensing and zoning provisions and the MRTMA.

Quality, however, argues that the City's zoning does not comply with MCL 333.27959(3)(c) because the latter does not allow a municipal body to decide that the buffer requirement does not apply. According to Quality, MCL 333.27959(3)(c) requires the municipality to "adopt an ordinance that reduces [the] distance requirement," as opposed to allowing a municipal body to make the decision. We disagree. The zoning ordinance then in effect allowed the City Commission to deviate from the buffer requirement "provided there are features or elements demonstrated by an applicant and deemed adequate by the City Commission upon the recommendation of the Planning Commission . . . ." Royal Oak Ordinances, § 770-52.1(B)(14). This provision, when implemented, reduced the buffer requirement of the MRTMA. See MCL 333.27959(3)(c). Notably, the MRTMA does not specify the procedure by which an ordinance reducing the buffer requirement is adopted. Quality's claim that § 770-52.1(B)(14) of the Royal Oak Ordinances conflicts with the MRTMA is not supported by the language of the statute. In fact, Quality's interpretation ascribes an intent not reflected in the statute's plain language. Because the City's ordinances do not conflict with MCL 333.27956(3) and MCL 333.27959(3)(c), Quality has failed to state a claim on which any relief can be granted.

## V. COMPETITIVE PROCESS MANDATE UNDER MCL 333.27959(4)

Quality argues that the marijuana ordinance conflicts with the MRTMA's competitive-process mandate on its face and that the City's application violated the MRTMA's competitive-process mandate. We disagree. The marijuana ordinance did not conflict with the competitive-process requirement of MCL 333.27959(4), and there was no genuine issue of material fact that

-16-

the city manager complied with the ordinance and the MRTMA.  We address each argument in turn.

Regarding the facial challenge, Quality argues that the ordinance conflicted with the MRTMA's competitive-process mandate because the selection process was inherently noncompetitive.  Essentially, Quality argues that the ordinance's use of binary, yes-or-no factors, and lack of a numerical ranking system left the City with no meaningful way to distinguish between applicants.

Here, Quality again raises a conflict preemption claim, i.e., a claim that "a local regulation directly conflicts with state law."  *Deruiter*, 505 Mich at 140.  This analysis necessarily begins with an examination of the relevant provisions of the MRTMA and the marijuana ordinance.

MCL 333.27956 allows a municipality to adopt a recreational marijuana ordinance.  That section provides in relevant part that, "[a] municipality may adopt other ordinances that are not unreasonably impracticable and do not conflict with this act or with any rule promulgated pursuant to this case . . . ."  MCL 333.27956(2).  Additionally, MCL 333.27959(4), mandates that a municipality use a "competitive process" to select among applicants if there are more applicants than available licenses:

> If a municipality limits the number of marihuana establishments that may be licensed in the municipality pursuant to section 6 of this act and that limit prevents the department from issuing a state license to all applicants who meet the requirements of subsection 3 of this section, *the municipality shall decide among competing applications by a competitive process intended to select applicants who are best suited to operate in compliance with this act within the municipality*. [Emphasis added.]

Because its marijuana ordinance restricted the number of recreational marijuana licenses, the City adopted the following "competitive" process:

> The applicants and their applications will be ranked in the order of which is best suited to operate in compliance with the Act within the City as determined by the City Manager or his or her designee.  This ranking will be used to fill available municipal license slots, starting with the best-suited applicant and application, until all available municipal license slots are filled.  The competitive criteria to be used shall be as follows:
>
> (a) Review of the applicant's completely submitted, detailed application (including plans which address the provisions of this section and related provisions, such as security, lighting, processing, handling of hazardous waste, site plans, recordkeeping, disposal, water/utility, ventilation, odor, etc.), which illustrates the likely success of the proposed business, in harmony with surrounding properties at the proposed site;
>
> (b) Whether the applicant is currently in default or arrears on any taxes or fees otherwise due to the City, has a history of noncompliance or violations with

City ordinances or applicable laws, or has been served with any complaint or notice filed by or with any public body regarding the delinquency in the payment of any tax required under federal, state or local law;

(c) Whether the applicant is/was a business operating in the City of Royal Oak within the past two years;

(d) Whether the applicant has a history of criminal conviction/plea, other than as specified by the MRTMA, MCLA 333.27958.1 (c), as may be amended;

(e) Whether the applicant has ever applied for or has been granted any commercial license or certificate issued by a licensing authority in Michigan or any other jurisdiction that has been denied, restricted, suspended, revoked, or not renewed, or has proceedings pending related to such;

(f) Whether the applicant filed, or had filed against it/him/her, a proceeding for bankruptcy or been involved in any formal process to adjust, defer, suspend or otherwise work out payment of a debt in the past seven years;

(g) Whether there is performed and planned future outreach on behalf of the proposed business and a written plan evidencing the outcome of such meetings, and whether the Applicant has made, or plans to make, significant physical improvements to the building housing the Marihuana Establishment

(h) Whether the applicant has taken steps to encourage employee retention, attract highly capable workers, train employees, and any other employee-employer factors tending to show a successful workforce;

(i) Whether the applicant has taken steps to include equity, diversity, and inclusion in their operations that would tend to yield greater profitability, innovation, and more-effective teamwork; and

(j) Whether the proposed plan incorporates sustainable infrastructure and energy-efficient elements and fixtures. [Royal Oak Ordinances, § 435-4(C)(4)(a)-(j).]

Nothing in MCL 333.27956, the section authorizing a municipality to impose local regulations on recreational marijuana, restricts or delineates what type of criteria may be used in formulating a "competitive process." See MCL 333.27956(2). See also MCL 333.27956(3). The only relevant direction is that any pertinent ordinance must not be "unreasonably impracticable" or "conflict" with the MRTMA. See MCL 333.27956(2).

Quality's argument that the marijuana ordinance's process is not "competitive" because competition requires a "situation in which people or businesses are trying to be more successful than each other . . . ." is not persuasive. Although the City used series of yes-or-no factors and did not use a numerical scoring system, there were still meaningful ways to distinguish the applicants, thus satisfying the "competitive" requirement within the meaning of MCL 333.27959(4).

-18-

MRTMA does not define "competitive process." We therefore rely on the plain meaning and ordinary understanding of "competitive" which is "relating to . . . competition," or "a contest between rivals" or "the effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/competition (accessed November 25, 2024). See also Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/competition (accessed November 25, 2024). When the relevant language is read as whole, then, MCL 333.27959(4) dictates that the process adopted must evaluate which applicants offer the most favorable terms, as compared to others, for the purpose of identifying which applicants are best suited to operate in compliance with the MRTMA. In other words, any criteria adopted must bear some relation to determining who is best suited to operate in compliance with the act, and must also aid in evaluating who offers the most favorable terms.

The marijuana ordinance's ten competitive criteria indicate that the ordinance does not lack a competitive process for selecting the applicants best suited to operate consistently with the MRTMA. See Royal Oak Ordinances, § 435-4(C)(4). On the contrary, many of the nine factors that call for a yes-or-no determination (out of 10 factors total) implicate varying degrees of compliance. For example, criterion (h) asks whether the applicant has taken steps to promote a successful workforce. Even if an applicant's response is affirmative, the way in which an applicant has met this end, and to what degree, would differentiate that applicant from others. The same may be said of responses to criteria (g) (future outreach), (i) (equity plans), and (j) (sustainable infrastructure), and to a lesser extent (c) (operating a business in Royal Oak), and (e) (commercial licenses). Further, consideration of the applicant's tax history, bankruptcy history, and criminal history potentially implicate variation and nuance. One bankruptcy is different than six. Someone owning property with a tax lien is different than a convicted tax cheat. Quality's argument ignores these nuances and inherent differences implicated by the considerations that do not otherwise provide a numerical rank or value.

Taken as a whole, the criteria serve as guideposts allowing a decision-maker to determine which applicants are most favorable for operating in compliance with the MRTMA, providing criteria an applicant may satisfy by varying degrees. Because the criteria allow for meaningful distinctions between applicants, the criteria are necessarily competitive.

There being no conflict with the MRTMA, and no allegation of unreasonable impracticality, Quality has failed to show that the City's competitive criteria improperly conflict with the MRTMA. Summary disposition under MCR 2.116(C)(8) was proper.[6]

---

[6] The City relies on *Yellow Tail Ventures*, 344 Mich App 703, where this Court upheld the city of Berkley's competitive criteria. Although this Court in *Yellow Tail Ventures* did uphold Berkley's competitive criteria, that case is not directly on point. The plaintiffs in *Yellow Tail* argued that MCL 333.27959(4) prohibited the city of Berkley from adopting criteria focused on such community concerns as green infrastructure. *Yellow Tail Ventures*, 344 Mich App at 701. Those plaintiffs did not argue that the criteria conflicted with MCL 333.27959(4) as binary or noncompetitive per se.

We also conclude that the circuit court properly granted summary disposition on Quality's as-applied challenge. Quality argues that the City's implementation of the competitive process ran afoul of both the MRTMA and the City's own marijuana ordinance, because the city manager admitted he did not understand his task to select applicants best suited to operate in compliance with the MRTMA and failed to rank or score the applicants, because the interpretation and application of the criteria were contrary to the text of the ordinance, and because some applicants were outright disqualified although the ordinance did not allow for disqualification. We are not persuaded.

"The law presumes public officials perform their duty." *Veldman v Grand Rapids*, 275 Mich 100, 113; 265 NW 790 (1936). Generally, "the discretion vested in city officials is not subject to review by the courts." *White v Grand Rapids*, 260 Mich 267, 275; 244 NW 469 (1932). Accordingly, "[i]f they transcend their power, the courts may interfere. But if acting within the scope of their power they make mistakes it is not the business of a court to amend or correct their errors." *Id*.

This manifests as two questions: (1) under what authority did the city manager act, and (2) whether the city manager acted outside of that authority. Taken as a whole, the record establishes that the City acted within its authority by applying a competitive process to selecting the licensees. As stated, we discern no conflict between the ordinance and the MRTMA. It employs 10 criteria of local concern. The city manager applied the ordinance to determine which applicant was best suited to comply with the act. Initially, he formed a workgroup with whom he collaborated to narrow down the applicants on the basis of the ordinance's criteria. Ultimately, the city manager reviewed all the applications, considered each in relation to the competitive criteria of the marijuana ordinance, compared the applicants to one another, and independently ranked the applicants into three categories consisting of the two successful applicants, applicants put on standby, and applicants who were rejected. There is no genuine issue of material fact as to whether the City violated either the MRTMA or its marijuana ordinance by implementing this competitive process.

Quality's argument that the city manager did not understand his task to be selecting the applicants best suited to operate in compliance with the MRTMA missed the point. Because the City's marijuana ordinance complied with the MRTMA's competitive-process requirement, and the city manager indicated that he selected applicants based on who was best suited to comply with the ordinance, he neither violated the MRTMA nor acted outside his authority.

Quality's argument that he failed to rank or score the applicants is similarly not persuasive. The city manager did rank the applicants by category. He just did not use a scoring rubric that Quality preferred. That the city manager gave greater weight to some criteria rather than others that may have favored Quality does not indicate that he acted outside his authority or provide a basis for disturbing the City's decision.

Relatedly, Quality attacks the City's interpretation of various criteria, many of which required subjective assessment which Quality alleges the ordinance did not contemplate. These arguments reflect Quality's dissatisfaction with the way the city manager applied the criteria. But

that does not amount to city manager acting outside the scope of his power.[7]  Quality has not demonstrated that the City acted outside of the scope of its authority under the MRTMA.

Finally, Quality additionally asserts that the circuit court's analysis was insufficient to warrant summary disposition, and the court improperly weighed evidence to make a factual determination regarding the city manager's conduct.  Although the circuit court's reasoning for granting summary disposition could have been more elaborative, its conclusion was proper because Quality failed to establish a genuine issue of material fact concerning whether the city manager's administration of the competitive process was inconsistent with the MRTMA or the City's marijuana ordinance.  Quality also fails to elucidate how the court weighed the evidence and made credibility determinations in the course of its limited analysis.

In sum, Quality's facial and as-applied challenge regarding conflicts with the MRTMA's competitive-process mandate both fail.

## VI. OMA VIOLATION

The circuit court erred by dismissing Quality's OMA claim.  Here, authority rested with the City Commission, "the public body."  It delegated authority to the city manager who was the de facto decisionmaker on awarding retail licenses.  Relying on our Supreme Court's decision *Pinebrook Warren, LLC v City of Warren*, ___ Mich ___ ; ___ NW3d___ (2024) (Docket Nos. 164869 through 164877) (*Pinebrook II*), which addressed this very same issue on similar facts, we conclude that an OMA violation occurred.

"The Open Meetings Act generally requires 'decisions' or 'deliberations' of a 'public body' to be open to the public." *Davis v Detroit Financial Review Team*, 296 Mich App 568, 576; 821 NW2d 896 (2012), citing MCL 15.262 and MCL 15.263.  Because the act applies only to a public body, the initial inquiry is whether the entity at issue constitutes a "public body."  MCL 15.262(a) defines "public body" to include "any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . ."

Generally, the statute provides that for an entity to be a public body, two requirements must be met: (1) "the entity at issue must be a 'state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council,' " and (2) "the entity must be 'empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function,' and that power must derive from 'state constitution, statute, charter, ordinance, resolution, or rule . . . .' " *Herald Co*, 463 Mich at 129, quoting MCL 15.262(a). Beyond the statutory definition of "public body," our caselaw has recognized an additional

---

[7] At worst, Quality may have shown that a mistake was made, e.g., a home-based business did not satisfy criterion (c) (whether an applicant had operated a business within the City in the last 2 years).  But even mistakes do not allow this Court to intervene so long as the city official was acting within the scope of his or her power. See *White*, 260 Mich at 275.  Quality's arguments on appeal would require this Court to substitute its judgment for that of the city manager.

pathway for qualifying as a public body: when one public body delegates authority to another entity. See *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 225-226; 507 NW2d 422 (1993) (holding that an individual member of the University of Michigan Board of Regents was a "public body" because the Board of Regents, itself a public body, had delegated the job of selecting a university president to the single regent). When a court is assessing such a delegation it must look not only at the language of the ordinance or governing document; it must also consider how the public body and the entity to which it supposedly delegated authority actually operated. See *Pinebrook II*, ___ Mich at ___; slip op at 8.

In *Pinebrook II*, our Supreme Court held that the de facto decision maker, a review committee, similar to the city manager in this case, was subject to the OMA. *Pinebrook II*, ___ Mich at ___; slip op at 9. There, the city of Warren had adopted a medical-marijuana ordinance consistent with then-governing state law. *Pinebrook I*, 343 Mich App at 127. The ordinance created a review committee to evaluate applications, score them, and forward them, along with the scores and recommendations, to the city council. *Id*. at 136. The ordinance authorized only the city council to approve the issuance of a license. *Id*. at 136. On appeal, this Court held that the review committee was not a public body subject to the OMA, rejecting the argument that the City had made the review committee a public body under *Booth* by delegating its authority to it. *Id*. at 150. Instead, the city's marijuana ordinance gave the review committee independent authority to act. *Id*. at 145-146.

Our Supreme Court reversed, holding that this Court erred by limiting its analysis to the language of the ordinance while failing to consider how the review committee actually worked. *Pinebrook II*, ___ Mich at ___; slip op 27. The Court clarified that

> in order to determine whether a public body has provided its authority to a different entity, thus subjecting that second entity to the OMA, we must examine both the language of the enabling action (in this case, an ordinance) and the actions actually taken by the new entity . . . . If the second entity makes public policy decisions that would otherwise have had to have been made by the original public body according to the law, then the second entity is also a public body covered by the OMA. [*Id*. at ___; slip op at 29 (citations omitted).]

Under this framework, the Court concluded that, even though the city's ordinance technically gave the city council the final authority to choose which applicants would be awarded licenses, it was the review committee that, in reality, chose the successful applicants. *Id*. at ___; slip op at 28-30. The Court relied on the fact that the review committee scored and ranked the applicants, and the city council simply adopted the work of the review committee by motion. *Id*. at ___; slip op at 29-32. The Court held that, because the review committee performed the governmental function of making decisions for the city council, the review committee was a public body subject to the OMA. *Id*. The Court distinguished *Herald Co* on the ground that the city manager in *Herald Co* did not obtain his authority from the City Commission, but from the city charter, while in Pinebrook Warren, the city council created the review committee and authorized it to act on behalf of the council. *Id*. at ___; slip op at 32-33.

Relying on *Pinebrook II* and *Booth*, we conclude that the city manager and his designees acted as a public body subject to the OMA. By way of analogy, here, the City Commission is to the city manager and his workgroup as the city council was to the review committee in *Pinebrook II*. Cf. *Pinebrook II* at ___; slip op at 29-32. The City Commission is a public body that granted the city manager "the power to fully and effectively implement and administer the Municipal License Application process." Royal Oak Ordinances, § 435-2(E). On paper, the marijuana ordinance did not grant the city manager authority to make the final decision on awarding retail licenses. Rather, the ordinance indicated that the "City shall decide among Applications" which were best suited to operate in compliance with the MRTMA, see Royal Oak Ordinances, § 435-4(C)(2) (emphasis added). The city manager was only empowered to "implement and administer" the application process and directed to rank the applicants by applying the 10 competitive criteria, see Royal Oak Ordinances, § 435-2(E) and § 435-4(C)(4)(a)-(j). The successful applicants do not automatically receive a license after this process. Instead, an applicant obtains the license only after the City Commission approves the applicant's special-land-use permit and site plan, and, if other requirements are met, the City Clerk issues the license. See Royal Oak Ordinances, § 435-4(D)(4) and (7). That is according to the ordinance.

In practice, however, the city manager's role was not limited to administering the applications process and scoring the applicants: whichever applicants made it through the city manager's process received licenses. The City received 31 applications for two retail licenses. To rank the applicants, the city manager formed a workgroup composed of several city officers. They met in four closed-door sessions to help the city manager assess the applicants. Ultimately, as a result of these meetings, the city manager ranked the applications in three categories, including a recommendation that the top two applicants be awarded a license.

While the ordinance tasked the "City" with deciding which applicants would be best suited to operate within the City, and also with approving the applicants' special-land-use and site permits as a predicate to issuing licenses, see Royal Oak Ordinances, § 435-4(C)(2) and (D)(4)(f), the City Commission adopted the city manager's recommendation without apparent deliberation. The minutes of the City Commission meeting with respect the special-land-use permit and site plan of the two highest-ranked applicants as recommended by the city manager do not reflect any discussion of other applicants. Consequently, the city manager effectively selected who would receive the two recreational marijuana licenses. Because the city manager made a de facto policy choice for the City Commission, the city manager met the definition of "governing body," and, thus, was subject to the OMA. It follows that the meetings that the city manager had with his workgroup should have been noticed and made open to the public.[8]

We understand our Supreme Court's decision in *Pinebrook II* as implicitly rejecting the City's argument that the City Commission did not delegate authority to the city manager because the MRTMA provided the city manager with an independent source of executive authority. The

---

[8] Standing alone, the workgroup did not qualify as a public body because no public body delegated authority to it. It acted solely in advisory capacity. The city manager made the ultimate ranking after consultation and there was no indication that the city manager delegated any of his authority under the marijuana ordinance to the workgroup.

city council in that case enacted an ordinance under the medical-marijuana law and established a review committee with authority to act on the city council's behalf, which the Court considered a delegation of city council's powers. *Pinebrook II*, ___ Mich at ___; slip op at 30. Similarly, here, the City Commission enacted an ordinance under the MRTMA, and, although the commission did not create the office of city manager through the ordinance, the commission authorized that officer to act on its behalf. The city manager's power in the licensing process derived from the marijuana ordinance, through the City Commission, not from the text of the MRTMA itself.

For these reasons, the circuit court erred by granting summary disposition in favor of the City with respect to the OMA claim. We reverse the court's decision related to the OMA claim and remand to the circuit court to determine whether the licenses awarded to Gatsby and Royal Treatment should be invalidated under MCL 15.270(2). We observe that the OMA provides other remedial options for the public body in this instance. See MCL 15.270(5) (providing a mechanism for a public body to "reenact the disputed decision in conformity with [the] act" to avoid invalidation).

## VII. SUBSTANTIVE DUE PROCESS

Quality also raises a substantive due process claim. It argues that the circuit court erred by granting summary disposition on its due-process claim because (1) to the extent it granted relief under MCR 2.116(C)(10), it failed to reference any material facts outside of the pleadings that would justify dismissal, and (2) to the extent it granted relief under MCR 2.116(C)(8), Quality argues it sufficiently alleged that the City acted arbitrarily and capriciously in awarding licenses. We disagree.[9]

The City's conduct in this matter did not rise to the level of substantive due-process violation. Substantive due process protects an individual against arbitrary government action. *Pinebrook I*, 343 Mich App at 158. The predicate for a due-process claim is a property interest at stake. *Id*. at 159. Because a first-time license applicant has no entitlement to a license, there is no property interest at stake. *Id*. at 160.

Further, this Court has limited such inquiry to whether a city has acted so arbitrarily and capriciously as to shock the conscience. *Id*. at 160-161; *Cary Investments, LLC v Mt Pleasant*, 342 Mich App 304, 316; 994 NW2d 802 (2022). Generally, "[r]efusal to issue a permit is not the

---

[9] Quality has likely abandoned this issue. Its argument is too cursory to warrant this Court's consideration. It does not cite any law explaining what requirements a first-time license applicant must meet to establish a due-process claim. Quality also does not highlight what evidence it proffered to establish the existence of a genuine issue of material fact in that regard. Instead, it summarily states the legal conclusion that its allegation that the City acted arbitrarily and capriciously stated a due-process claim, while offering no explanation of what the law requires. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *Houghton*, 256 Mich App at 339 (citations omitted). Because Quality failed to properly address the merits of this claim of error, this issue is likely abandoned. Nonetheless, we elect to address the merits.

-24-

sort of municipal action that constitutes a violation of substantive due process," *Cary Investments*, 342 Mich App at 315, and "[p]icking winners and losers, although it might seem unfair, does not amount to irrational conduct or oppression, and it does not shock the conscience," *Pinebrook I*, 343 Mich App at 165.

The City simply denied Quality a permit. Quality has not established that the City violated either the MRTMA or its marijuana ordinance, or alleged any conduct that is so egregious and irrational that it shocks the conscious. Summary disposition of the substantive due-process claim was proper because Quality has brought to light no genuine issue of material fact concerning whether the City engaged in arbitrary, irrational, or oppressive conduct.

## VIII. CONCLUSION

For the reasons previously stated, we affirm the circuit court's grant of summary disposition in all respects except as it relates to its handling of the OMA violation. Because an OMA violation occurred, the circuit court erred in dismissing those claims. We therefore reverse the circuit court's decision regarding the OMA violation and remand for the circuit court to address whether invalidation of the license awards is appropriate under MCL 15.270(2) and to provide the public body with the opportunity to remedy to violation. See MCL 15.270(5). In all other respects, we affirm. We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Mark T. Boonstra
/s/ Kathleen Jansen

-25-